[No. 85200-6.   En Banc.]
Argued September 15, 2011.   Decided March 15, 2012.

DANA CLAUSEN, *Respondent*, v. ICICLE SEAFOODS, INC.,
*Appellant*.

*Michael A. Barcott* and *Megan E. Blomquist* (of *Holmes Weddle Barcott PC*) and *Thaddeus O'Sullivan* (of *K&L Gates LLP*), for appellant.

*Philip A. Talmadge* (of *Talmadge/Fitzpatrick*) and *James P. Jacobsen* (of *Beard Stacey & Jacobsen LLP*) (*Lawrence N. Curtis*, of counsel), for respondent.

*Lincoln D. Sieler* and *David W. Robertson* on behalf of Inlandboatmen's Union of the Pacific, amicus curiae.

¶1 C. JOHNSON, J. — This case involves a maritime claim for maintenance and cure and whether, under federal maritime law, a judge, instead of a jury, awards attorney fees following the jury award of compensatory and punitive damages in favor of an injured seaman against the employer for willful failure to pay maintenance and cure. This case also involves whether the jury's award for punitive damages must be limited and reduced under federal maritime law.

¶2 We hold that a judge determines and awards attorney fees in a maintenance and cure case and that the jury's punitive damage award for the willful withholding of maintenance and cure is not limited by federal maritime law cases. We affirm.

## FACTS

¶3 Dana Clausen worked on board Icicle Seafoods' *Bering Star* as second engineer when he sustained his injuries. As an engineer, he performed various duties, including fixing machinery used aboard the vessel. In February 2006, Clausen suffered serious injury to his lower back, neck, and hand when he lifted a 122-pound piece of steel. After reporting the injury to Icicle, he went ashore in Alaska for initial medical care and was eventually sent home to Louisiana for further care.

¶4 Clausen encountered persistent difficulties in getting Icicle and its adjusting firm, Spartan, to meet its obligation to pay him maintenance and cure, traditional maritime remedies providing living and medical expenses, during his recovery. During this period, Clausen was unable to work due to his injuries. As part of its obligation to pay maintenance for Clausen's living expenses, Icicle paid Clausen $20

per day to cover lodging, utilities, and meals. Clausen resorted to living in a recreational vehicle with a leaking roof and with no heat, air conditioning, running water, or toilet facilities. Additionally, on its obligation to pay cure for Clausen's medical expenses, Icicle delayed or refused to pay for treatment that Clausen's doctors recommended.

¶5 In a May 2006 report to Icicle, Spartan confirmed that Clausen's injuries were likely career-ending and recommended that Icicle authorize settlement before Clausen secured legal representation. In a June 2006 letter, Clausen's doctor told Icicle that Clausen needed treatment by epidural spinal injections and was a candidate for back surgery. About a week later, an internal report recommended that Icicle meet face-to-face with Clausen to propose settlement. The June 2006 letter was never disclosed to Clausen.

¶6 In September 2007, Icicle filed suit in federal court against Clausen to terminate Clausen's right to maintenance and cure, alleging that he impeded their right and obligation to investigate his claim. After the complaint was filed, Clausen hired counsel who issued subpoenas for Spartan's and his medical providers' records, which revealed that Icicle had extensively monitored and investigated the ongoing status of his condition.

¶7 Upon learning of Icicle's actions, Clausen filed the present action in King County Superior Court and Icicle's suit in federal court was dismissed. Clausen sought damages for Icicle's negligence under the Jones Act, 46 U.S.C. § 30104, unseaworthiness of the *Bering Star*, and wrongful withholding of maintenance and cure. The jury found Icicle negligent under the Jones Act, awarding Clausen $453,100 in damages. Clerk's Papers (CP) at 111-12. The jury also found that Icicle was callous or willful and wanton in its failure to pay maintenance and cure, awarding Clausen $37,420 in compensatory damages for maintenance and cure plus $1.3 million in punitive damages for Icicle's willful misconduct. CP at 108, 114.

¶8 After the verdict, Clausen filed a posttrial motion requesting attorney fees. Icicle opposed the fee request by moving for judgment as a matter of law, arguing that under federal maritime law only the jury could award attorney fees. Icicle also argued for a reduction in the amount of attorney fees sought because Clausen's attorneys failed to keep contemporaneous time records, reducing the reliability and "reasonableness" of the hours claimed. The trial court denied Icicle's motion, ruling the attorney fees issue was for the court, not the jury; the court also noted Icicle took no issue with the amount of time spent on various tasks, making no claim that Clausen's attorneys wasted time or duplicated efforts. The court determined that under federal maritime law, Clausen could recover attorney fees and costs only for time spent on his maintenance and cure claim. Because Clausen's three claims were intertwined, making the hours spent on each claim difficult to segregate, the trial court reduced his total fees and costs by 10 percent and awarded $387,558.00 in fees and $40,547.57 in costs. CP at 432.

¶9 Icicle also filed a motion to amend the judgment challenging the jury's punitive damage award, which the trial court denied.

¶10 Icicle appealed. We granted Clausen's motion requesting transfer to this court due to the significant federal maritime law issues involved. Icicle assigns error to the award for attorney fees and to the punitive damages related to maintenance and cure. Icicle challenges the amount of the attorney fees award, and it argues that under federal maritime law (1) only the jury can award attorney fees as damages and (2) punitive damages cannot exceed compensatory damages. We affirm the trial court.

## ISSUES

¶11 1. Whether under general maritime law, the court and not the jury determines the amount of attorney fees

related to the jury's punitive damage award for the employer's willful withholding of maintenance and cure.

¶12 2. Whether under general maritime law, punitive damages for willful withholding of maintenance and cure must be capped.

## ANALYSIS

### 1. Attorney Fees

¶13 The trial court concluded that the attorney fees issue in a maintenance and cure action was for the court, not the jury, and awarded fees and costs. Icicle contends the trial court erred because attorney fees are a form of punitive damages to be found by the jury. Icicle also objects to the amount of fees the trial court awarded. These issues involve both questions of law and review of discretionary orders by the trial court.

¶14 Maritime actions brought in state courts are governed by federal maritime law, both common law (referred to here as "general") and statutory. Injured seamen do not qualify for state or federal worker compensation for on-the-job injuries. RCW 51.12.100(1); 33 U.S.C. § 902(3)(G). Seamen, however, retain the right to sue for personal injury under the Jones Act. Additionally, under general maritime law, the injured seaman can seek an award for unpaid maintenance and cure. "Maintenance" is the living allowance for food and lodging while "cure" is the right to necessary medical services. *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528, 58 S. Ct. 651, 82 L. Ed. 993 (1938). A seaman is also entitled to unearned wages for the period from the onset of the injury or illness until the end of the voyage. The right to maintenance and cure extends to the point of maximum medical cure. *Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S. Ct. 997, 8 L. Ed. 2d 88 (1962).

¶15 The doctrine of maintenance and cure, an ancient right in British admiralty law, was introduced into American maritime law by Justice Story in *Harden v.*

*Gordon*, 2 Mason 541, 11 F. Cas. 480, 482-83 (C.C.D. Me. 1823). Justice Story expressed concern for seamen whose work made them vulnerable to sickness from climate, peril, and exhausting labor; who suffered away from home from disease, poverty, and lack of nourishment; and whose earnings were insufficient to provide for the expenses of their sickness. Subsequently, the United States Supreme Court recognized the right in *The Osceola*, 189 U.S. 158, 169, 23 S. Ct. 483, 47 L. Ed. 760 (1903). Since then, the Court has articulated that the underlying policy of maintenance and cure is (1) to protect the poor and improvident seaman from being abandoned while ill or injured in foreign ports, (2) to induce employers to protect the safety and health of seamen while in service, and (3) to induce employment in maritime service. *Calmar*, 303 U.S. at 528 (citing *Harden*, 11 F. Cas. 480).

██ ██ ¶16 Because maintenance and cure is a right created under common law, courts have fashioned equitable remedies to further the underlying policies. As to recovery of attorney fees, the United States Supreme Court recognized the remedy in *Vaughan*. In that case, the lower court had denied fees on the basis that the fees were not recoverable in a breach of contract suit. The United States Supreme Court reversed, recognizing that the duty to provide maintenance and cure was created at law, not by an employment contract. As a result, the Court held that while the failure of an employer to pay maintenance and cure gives rise to damages for the suffering and physical disability that followed, the recovery for those damages could also include "necessary expenses," including counsel fees. The Court then emphasized that the employer's callous and willful behavior in withholding maintenance and cure forced the seaman to bring suit to recover what was plainly owed to him under the law. *Vaughan*, 369 U.S. at 531-33. Thus, under general maritime law, it developed that a finding that an employer acted callously or willfully in withholding maintenance and cure was a basis for recovering attorney fees and punitive damages.

¶17 Icicle contends, based on the Court's reasoning in *Vaughan* and purported clarification in *Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009), that attorney fees are punitive, and the fees are a form of punitive damages in maintenance and cure actions. Icicle argues that because the jury always awards and calculates damages, as a matter of substantive general maritime law, the trial court's determination and attorney fees award should be vacated. Icicle cites Fifth Circuit Court of Appeals cases as support for this argument.[1] We disagree.

¶18 The United States Supreme Court in *Vaughan* was unclear on whether the fees were compensatory or punitive in nature, but its rationale and other cases citing *Vaughan* lead us to conclude the fees are compensatory. While the fees are awarded on the same general basis as punitive damages, that is, only upon a callous and willful finding, that does not make the fees punitive. The purpose of punitive damages is to punish the defendant and deter similar conduct. On the other hand, the purpose of compensatory damages is to make the plaintiff whole for their injury, for example for pain and suffering and, in this case, for maintenance and cure payments. The United States Supreme Court made clear that the failure to give maintenance and cure may give rise to damages for pain and suffering but that the "recovery may also include 'necessary expenses.'" *Vaughan*, 369 U.S. at 530 (quoting *Cortes v. Balt. Insular Line*, 287 U.S. 367, 371, 53 S. Ct. 173, 77 L. Ed. 368 (1932)). There, necessary expenses were the attorney fees the seaman incurred for being forced to bring a suit. *Vaughan*, 369 U.S. at 530. Thus, while the fees are tied to a certain level of culpability, the focus is on compensating the seaman for necessary expenses incurred in litigation, rather than on punishing and deterring the employer. Although fee-shifting in this context may have a

---

[1] *See, e.g., Holmes v. J. Ray McDermott & Co.*, 734 F.2d 1110 (5th Cir. 1984).

punitive feel, it serves to compensate the seaman for being forced to bring an action to recover what he was clearly entitled to all along.

¶19 At common law, an award for attorney fees is created in equity as an exception to the American rule that parties bear their own costs and fees in litigation.[2] In a maintenance and cure action, equity supports a recovery of such fees only where the payments were withheld because of the employer's misconduct; the jury must find callous or willful behavior, which it did here. In other cases, the United States Supreme Court discusses the fees award in *Vaughan* as an equitable exception to the American rule. *See, e.g.*, *Summit Valley Indus., Inc. v. Local 112, United Bhd. of Carpenters & Joiners of Am.*, 456 U.S. 717, 721, 102 S. Ct. 2112, 72 L. Ed. 2d 511 (1982); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975). Several circuits also treat *Vaughan* as establishing an equitable basis for awarding attorney fees and have affirmed the trial judge's determination of the amount of fees after the jury returns a favorable verdict to the seaman.[3] The Second Circuit in *Incandela v. American Dredging Co.*, 659 F.2d 11, 15 (2d Cir. 1981), has held that fees are assessed by the trial court after the jury makes the factual finding as to whether the defendant's actions are willful and arbitrary. *See also Williams v. Kingston Shipping Co.*, 925 F.2d 721 (4th Cir. 1991). Likewise, we interpret *Vaughan* as creating an equitable basis to award attorney fees under the American rule.

---

[2] Under the American rule, attorney fees are recoverable only when authorized by private agreement of the parties, or statute, unless an equitable exception exists. *Summit Valley Indus., Inc. v. Local 112, United Bhd. of Carpenters & Joiners of Am.*, 456 U.S. 717, 721, 102 S. Ct. 2112, 72 L. Ed. 2d 511 (1982).

[3] For example, comments to Ninth Circuit Model Civil Jury Instruction 7.12, "Maintenance and Cure—Willful and Arbitrary Failure To Pay," provide, "If the jury finds that the defendant willfully and arbitrarily failed to pay maintenance or cure, the plaintiff will be entitled to reasonable attorneys' fees as determined by the court." MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT 7.12 cmt. at 120 (2007).

¶20 Icicle contends the *Townsend* decision, a case in which the United States Supreme Court cited *Vaughan* in the context of punitive damages, clarifies or alters the rule regarding recovery of attorney fees. We find Icicle's reliance on *Townsend* unpersuasive because the issue in *Townsend* was not whether the attorney fees were a form of punitive damages. Rather, the issue was whether remedies available at general maritime law were restricted because of the Jones Act. The Court held that remedies under general maritime law, such as punitive damages, remained available. The Jones Act created a statutory cause of action for negligence, which had been barred at general maritime law. Because Congress, by enacting the Jones Act, created a new cause of action, the Court recognized the Jones Act expanded and supplemented, rather than restricted, the rights of seamen under maritime law. And while the Jones Act excluded recovery of certain types of damages, such as for loss of society or lost future earnings, the Court held that those restrictions applied only to claims brought under the Jones Act. In other words, the statutory limitations did not affect the types of damages recoverable under general maritime law, such as punitive damages in maintenance and cure actions. *Townsend*, 557 U.S. at 407, 415-18. While *Vaughan* is cited, the issue and holding in *Townsend* relates to the continued viability of common law causes of action and remedies, not whether a recovery of attorney fees under *Vaughan* is punitive or compensatory. Given this, *Townsend* cannot stand for or be read to alter the nature or availability of attorney fees.

¶21 Allowing a judge to determine and calculate an equitable fees award is consistent with our practice in Washington and makes procedural sense. Primarily, the fee recovery is not part of the plaintiff's substantive claim for damages; in this case, the seaman's damages are for maintenance and cure. The plaintiff must prove the substantive claim and further, the jury must specifically find callous or willful conduct before a plaintiff qualifies for an attorney

fees recovery. Given this, it is procedurally impractical to have a jury consider evidence of attorney fees when it has not yet made the necessary finding to award those fees. The attorney fees issue becomes relevant only after a verdict is rendered, that is, posttrial. Even then, the plaintiff's fees recovery is subject to the judge's determination that there is an equitable basis to award fees. And, a trial judge, who is more familiar with advocacy and trial preparation, is better suited to determine the reasonableness of the fees award and whether particularities of the case require the fee request to be adjusted. We agree with the trial court and hold that under general maritime law, a trial judge, and not the jury, calculates an attorney fees award related to the employer's willful withholding of maintenance and cure.

¶22 After the jury returned the verdict, Clausen requested attorney fees in a posttrial motion. Icicle challenges the amount awarded. We review a trial court's award of attorney fees for an abuse of discretion. *Chuong Van Pham v. Seattle City Light*, 159 Wn.2d 527, 538, 151 P.3d 976 (2007) (citing *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). A trial court initially determines attorney fees and costs using the "lodestar" calculation, multiplying the total number of hours reasonably expended in the litigation by the reasonable hourly rate. Once the lodestar has been calculated, the court may adjust the fee to reflect factors not considered yet. The two categories for adjustment are based on whether the fee was contingent on the outcome and the quality of work performed. The party requesting an adjustment has the burden to show the deviation is justified. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597-99, 675 P.2d 193 (1983).

¶23 The trial court estimated that 90 percent of the attorneys' time was spent on issues related to maintenance and cure and, accordingly, reduced total fees and costs by 10 percent. The court recognized that maintenance and cure issues were present from the beginning of the case and that 12 out of 14 witnesses testified about those issues. The

court also acknowledged that this was the attorneys' first case involving punitive damages for maintenance and cure, suggesting that the issue required a significant amount of time.

¶24 Icicle contends it was improper for the trial court to segregate hours spent on the maintenance and cure claim from other claims based on a generalized percentage reduction rather than on actual hourly records. Appellate courts, however, have permitted the use of a percentage reduction in segregating fees and costs when, as here, the specifics of the case make segregating actual hours difficult. Other maintenance and cure cases support the trial court's determination here. *See Deisler v. McCormack Aggregates Co.*, 54 F.3d 1074, 1087 (3d Cir. 1995) (recognizing the difficulty in segregating hours and holding the use of 10 percent reduction to calculate fees and costs not an abuse of discretion); *see also Peake v. Chevron Shipping Co.*, No. C00-4228 MHP, 2004 A.M.C. 2778, 2791 (N.D. Cal. Aug. 10, 2004) (unpublished) ("overlap" in claims warranted a 20 percent reduction).

¶25 Icicle argues the trial court's reliance on *Deisler* and *Peake* is misguided. Icicle contends that in *Deisler* the 10 percent reduction was justified because the plaintiff had to prove an accident occurred,[4] arguably taking more time, whereas in this case Clausen did not. Still, this difference does not necessarily mean the maintenance and cure claim would take less time in Clausen's case. Each case has its own peculiarities, and the trial court is best situated to make these determinations.

¶26 Additionally, Icicle contends that in *Peake* the court awarded only 44 percent of fees and costs, but *Peake* actually supports the trial court's decision here. There, the

---

[4] In *Deisler*, the employer refused to pay maintenance and cure based on its claim the seaman had not been injured in an accident. The accident also related to the negligence claim under the Jones Act. Because the trial court found it impossible to segregate the maintenance and cure claim from the Jones Act claim, the trial court apportioned the time as 90 percent to maintenance and cure and 10 percent to the Jones Act claim and reduced attorney fees by 10 percent. *Deisler*, 54 F.3d at 1087.

court accepted counsels' contention that 80 percent of the time was spent on the maintenance and cure claim but reduced the number of hours after finding some of the hours were duplicative and inadequately documented. Here, Icicle makes no claim that the hours themselves were invalid. Again, the trial court is in the best position to make this determination. No abuse of discretion has been shown.

¶27 Icicle also does not show the trial court abused its discretion in setting the hourly rate for Clausen's attorneys. An attorney's hourly rate is determined in reference to a reasonable rate. The court may consider the attorney's usual billing rate, the level of skill required by the litigation, the time limitations imposed on the litigation, the amount of potential recovery, the attorney's reputation, and the undesirability of the case. *Bowers*, 100 Wn.2d at 597. Here, the court supported its findings based on declarations from Clausen's attorneys describing their qualifications, which Icicle did not challenge. The court also considered a survey indicating that the hourly rate was reasonable for attorneys with similar qualifications.

¶28 The record here reflects that the trial court properly exercised its discretion in determining the number of hours related to the maintenance and cure claim and the reasonable hourly rate for Clausen's attorneys. We affirm the trial court's award of attorney fees and costs.

## 2. Punitive Damages

¶29 Icicle contends that under federal law, the trial court erred in failing to reduce the judgment by not capping the jury's $1.3 million punitive damage award. Icicle makes no assertion that Clausen was not entitled to punitive damages or that the trial court used the incorrect standard to determine whether punitive damages were excessive. Rather, Icicle argues the trial court was required to reduce the jury's award of punitive damages in accordance with *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008), where the United States Supreme

Court reduced a punitive damages award applying a 1:1 ratio to compensatory damages. We disagree with Icicle's reading of the scope of the *Exxon* case.

¶30 In the *Exxon* case, the United States Supreme Court's decision involved punitive damages awarded for the *Exxon Valdez* oil spill in Alaska. The jury had awarded $507 million in compensatory damages and $4.5 billion in punitive damages, which, upon remand by the Ninth Circuit, was reduced to $2.5 billion. The United States Supreme Court further limited the punitive damages award, capping punitive damages at a 1:1 ratio to compensatory damages. In its decision, the Court discusses the history, development, and justifications underlying the creation of the punitive damages remedy. The Court recognized that a punitive damages remedy advances the goals of punishing egregious and willful behavior resulting in injury and punishing conduct designed and intended to provide some financial gain to the offending party, as well as deterring similar conduct. The Court also recognized that punitive damages awards failing to advance these goals not only would be carefully scrutinized, but could be subject to constitutional due process concerns. In essence, the Court established that under general maritime law, punishment for conduct minimally related to the goals of punishment could be limited and subject to a 1:1 ratio with compensatory damages, which in the *Exxon* case were substantial. Important to the analysis here, throughout the *Exxon* case, the Court emphasized it was faced with facts establishing that Exxon's conduct was not at the extreme end of the scale of egregiousness, no profit motive was expressly involved, and there was already a substantial recovery for damages. *Exxon*, 554 U.S. at 510-13.

¶31 We find nothing in the *Exxon* case establishing a general rule limiting the jury's role in determining appropriate damages. The *Exxon* case cannot be read as establishing a broad, general rule limiting punitive damage awards, primarily because nowhere in the opinion can such

a rule be found. To the contrary, the United States Supreme Court expressly limits its holding to the facts presented. In the first paragraph of the opinion, the issue is framed as "whether the award . . . *in this case* is greater than maritime law should allow *in the circumstances.*" *Exxon*, 554 U.S. at 476 (emphasis added).

¶32 Toward the end of its analysis, the Court again, in the context of analyzing the spectrum of laws and cases establishing limits on punitive awards, observes that "the upper limit is not directed to cases *like this one*, where the tortious action was worse than negligent but less than malicious . . . ; the 3:1 ratio . . . applies to awards in *quite different* cases involving . . . malicious behavior and dangerous activity carried on for the purpose of increasing a tortfeasor's financial gain. We confront, instead, *a case* of reckless action, profitless to the tortfeasor." *Exxon*, 554 U.S. at 510-11 (footnotes omitted). Continuing in that same paragraph, during its discussion of limits established legislatively, the Court states, "Thus, a legislative judgment that 3:1 is a reasonable limit overall is not a judgment that 3:1 is a reasonable limit *in this particular type of case.*" *Exxon*, 554 U.S. at 510-11 (emphasis added). Nothing in the *Exxon* opinion can be read as overruling cases allowing higher punitive awards or limiting the government's ability to statutorily provide other limits. Quite the opposite, the Court seems to embrace an approach of applying a variable limit based on the tortfeasor's culpability. *Exxon*, 554 U.S. at 510 n.24.

¶33 Here, as found by the jury and confirmed by the trial court, Icicle's conduct lies at the extreme end of the scale. The jury found that Icicle acted callously or willfully and wantonly in its failure to pay maintenance and cure. And the trial court, in denying Icicle's motion to reduce the punitive damages award, entered findings of fact emphasizing Icicle's egregious conduct. The court found that Icicle intentionally disregarded Clausen's health by refusing to pay for his spinal injections and surgery that Icicle's own "hand-

picked" doctor had recommended, and that Icicle provided Clausen only $20 per day in maintenance and knew Clausen was practically homeless, living in a broken down recreational vehicle, yet it wanted Clausen to take the "bait" and settle early without legal representation. The court also found that Icicle deliberately made false statements in its federal court complaint seeking to terminate Clausen's maintenance and cure; that Icicle's conduct was motivated by profit; and that the size of the punitive damages award was required because Icicle needed substantial deterrence not to treat other workers in the same way it treated Clausen, noting that Icicle had claimed no wrongdoing throughout the suit.

¶34 Unlike the reckless conduct the *Exxon* Court faced, here, the jury found and the trial court described in depth that Icicle's actions were far from reckless and nearer the "most egregious" end of the culpability scale. The *Exxon* Court was clear that it was applying a ratio limiting the punitive damages award due to the circumstances of the case, that is, reckless conduct not expressly motivated by profit, where a substantial compensatory damages recovery existed. But while it limited the punitive damages award in *Exxon*, the Court embraced a variable limit approach based on culpability. Given the facts of our case, it is appropriate to apply that principle here. Icicle's conduct was not just reprehensible, it was egregious.

¶35 The availability of punitive damages, without a 1:1 ratio to compensatory damages, for willful withholding of maintenance and cure is necessary because it also serves as a deterrent. A variable punitive damages award creates a disincentive to employers who would otherwise prefer to hold out on paying maintenance and cure until a suit is filed, if at all. Because seamen do not qualify for state or federal worker compensation, their only recourse from being abandoned when sick or injured on the job is maintenance and cure. But it appears Icicle wanted to do just that by intentionally withholding maintenance and cure, at

the expense of Clausen's health, and then by attempting to terminate maintenance and cure. Icicle, and any employer, must be deterred from profiting at the expense of its employee's health. The availability of punitive damages serves as this deterrent since the simple solution for employers to avoid exposure to punitive damages in a lawsuit is by complying with their maritime responsibilities.

¶36 Lastly, Icicle contends the trial court erred when calculating the punitive damages ratio because it included the attorney fees award in the compensatory damages figure.[5] The compensatory nature of attorney fees does not change because the attorney fees are awarded posttrial rather than with the jury's compensatory damages award. Courts in other jurisdictions include attorney fees as part of the compensatory damages award for punitive damages ratio comparison purposes. *See, e.g., Blount v. Stroud*, 395 Ill. App. 3d 8, 915 N.E.2d 925, 944, 333 Ill. Dec. 854 (2009) (courts consider attorney fees as part of compensatory award when considering the punitive damages award ratio); *Action Marine, Inc. v. Cont'l Carbon, Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007); *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 235-36 (3d Cir. 2005). As mentioned, the reason Clausen incurred any attorney fees was for having to bring a suit to recover maintenance and cure payments. Like a recovery for maintenance and cure payments, recovery of attorney fees is compensatory in that those fees attempt to make Clausen whole for the employer's actions in intentionally failing in its maritime duty to provide maintenance and cure. It was proper for the trial court to include attorney fees as part of the compensatory damages award when calculating the punitive damages ratio. No error occurred.

---

[5] After including the attorney fees in the compensatory award, the trial court found the punitive damages award was less than three times the size of the compensatory award and within due process limits. Because Icicle does not contend the punitive damages award violates due process, we need not determine whether the trial court used the correct standard or applied it properly.

## CONCLUSION

¶37 We conclude that under federal maritime law, the trial court calculates an attorney fee award related to a maintenance and cure action. We also conclude that under federal maritime law, the punitive damages award as determined by the jury here, based on the callous or willful and wanton withholding of maintenance and cure, was proper.

¶38 We affirm. We award costs, including reasonable attorney fees, to Clausen as the prevailing party pursuant to RAP 18.1(a).[6]

MADSEN, C.J., and CHAMBERS, OWENS, FAIRHURST, STEPHENS, and WIGGINS, JJ., concur.

¶39 J.M. JOHNSON, J. (dissenting) — This is a case governed by federal maritime law. Today, the majority ignores instruction from the United States Supreme Court—the final arbiter of federal maritime law—as articulated in *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008). In *Exxon*, the Supreme Court held that in maritime cases, punitive damage awards cannot be excessive in relation to the actual harm caused. *Id.* at 503 (holding the appropriate ratio of punitive to compensatory damages in that case was 1:1). Following this decision, I would hold the $1.3 million punitive damage award in this case must be reduced as it is excessive and bears no relation to the compensatory award of $37,420.

¶40 *Exxon* was a class action brought by commercial fishermen, Native Alaskans, and landowners harmed by the *Exxon Valdez* oil spill. *Id.* at 476. The spill resulted when

---

[6] On review, because this award is primarily based in equity, not contract or statute, we award reasonable attorney fees and costs to Clausen on the same basis supporting the trial court's attorney fees award.

the *Valdez*'s intoxicated captain, Joseph Hazelwood, left the ship's bridge at the time his presence was needed to perform a critical turn. *Id.* at 477-78. Hazelwood also put the ship on autopilot, causing it to speed up and rendering the turn more difficult. *Id.* at 478. The ship grounded, ripping the hull and spilling 11 million gallons of crude oil into Prince Edward Sound. *Id.* The evidence indicated Exxon knew Hazelwood was a relapsed alcoholic but nevertheless placed him in charge of a 900-foot oil tanker in a region that was notoriously difficult to navigate. *Id.* at 477. The jury assessed $507.5 million in compensatory damages and $5 billion in punitive damages against Exxon. *Id.* at 480-81. The Ninth Circuit Court of Appeals remitted the punitive award to $2.5 billion on due process grounds. *Id.* at 481.

¶41 The United States Supreme Court reviewed the punitive damage award for conformity with federal maritime law. *Id.* at 489-90. It expressed concern over the unpredictability of punitive damage awards. *Id.* at 499. Unpredictable awards fail to promote one of the essential goals of punitive damages: deterrence. *Id.* at 502 ("[A] penalty should be reasonably predictable in its severity, so that even Justice Holmes's 'bad man' can look ahead with some ability to know what the stakes are in choosing one course of action or another."). The *Exxon* Court was particularly troubled by "outlier" punitive damage awards "that dwarf the corresponding compensatories," much like the punitive damage award in this case. *Id.* at 500.

¶42 To solve the problem of runaway punitive damage awards, the *Exxon* Court concluded that punitive damages should be "pegg[ed] . . . to compensatory damages using a ratio . . . ." *Id.* at 506. The Court analyzed ratios ranging from 3:1 to 1:1. *Id.* at 507-13. The Court considered a 3:1 ratio inappropriate in *Exxon*, even though it reflected the statutory cap in a majority of states, because the 3:1 ratio is often applied to the "most egregious conduct." *Id.* at 510-11 ("[A] legislative judgment that 3:1 is a reasonable limit overall is not a judgment that 3:1 is a reasonable limit in

this particular type of case."). The Court next calculated the median ratio of punitive to compensatory damages actually awarded in a cross section of cases. They arrived at a ratio close to 1:1, which was deemed to reflect "what juries and judges have considered reasonable across many hundreds of punitive awards." *Id.* at 512. Based on "the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary," the *Exxon* Court held a 1:1 ratio was the "fair upper limit" in that case. *Id.* at 513.

¶43 The majority avoids *Exxon* by claiming the case does not establish "a general rule limiting the jury's role in determining appropriate damages." Majority at 84. But, the *Exxon* decision has been interpreted by other courts and scholars as limiting punitive damage awards in maritime cases, with the potential for even broader application. *See, e.g., Duckworth v. United States*, 418 F. App'x 2, 3 (D.C. Cir. 2011) (unpublished) ("In [*Exxon*], the Supreme Court addressed 'punitive damages in maritime law . . .' and held that a *jury's* award of punitive damages may not exceed the amount of compensatory damages in a federal maritime case." (quoting *Exxon*, 554 U.S. at 489-90)); *Hayduk v. City of Johnstown*, 580 F. Supp. 2d 429, 484 n.46 (W.D. Pa. 2008) ("Although *Exxon* is a maritime law case, it is clear that the Supreme Court intends that its holding have a much broader application."); Joni Hersch & W. Kip Viscusi, *Punitive Damages by Numbers:* Exxon Shipping Co. v. Baker, 18 SUP. CT. ECON. REV. 259, 259 (2010) ("The U.S. Supreme Court decision in *Exxon Shipping Co. v. Baker* is a landmark that establishes an upper bound ratio of punitive damages to compensatory damages of 1:1 for maritime cases, with potential implications for other types of cases as well."); Victor E. Schwartz et al., *The Supreme Court's Common Law Approach to Excessive Punitive Damage Awards: A Guide for the Development of State Law*, 60 S.C. L. REV. 881, 882 (2009) ("Will state courts view the [*Exxon*] decision as solely limited to the field of federal maritime law, or will the

high court's powerful reasoning broadly influence state courts struggling to cabin in 'outlier' punitive damage verdicts?").

¶44 Dissenting in part in *Exxon*, Justice Ginsburg emphasized the weight of the Court's decision. Wary of its ramifications beyond the context of maritime law, she queried, "[I]s the Court holding only that 1:1 is the maritime-law ceiling, or is it also signaling that any ratio higher than 1:1 will be held to exceed 'the constitutional outer limit'?" *Exxon*, 554 U.S. at 524 (Ginsburg, J., dissenting in part). Given *Exxon*'s potential to influence even non-maritime cases, the majority's attempt to restrict the case to its facts is unconvincing.

¶45 The holding in *Exxon* surely controls maritime cases like this one. The majority reasons that the 1:1 ratio applied in *Exxon* is inappropriate under these facts and therefore no limiting ratio whatsoever should be applied. While the facts of this case do not mirror *Exxon*, the basic rationale of *Exxon* still governs. At its core, *Exxon* stands for the premise that punitive damage awards in maritime cases cannot be excessive when compared with the actual harm caused by the defendant. *Id.* at 503 ("The common sense of justice . . . bar[s] penalties that reasonable people would think excessive for the harm caused in the circumstances."). The degree that a punitive damage award may depart from the corresponding compensatory award depends on the facts of the case, including the culpability or blameworthiness of the defendant, whether the wrongdoing was hard to detect, and the size of the compensatory award. *Id.* at 493-94. In other words, *Exxon* instructs that punitive awards in maritime cases should "pegg[ed] . . . to compensatory damages" in a manner suited to the circumstances of the case. *Id.* at 506.

¶46 The highest ratio considered potentially applicable in *Exxon* was 3:1. *Id.* at 510. This ratio was considered appropriate only for cases "involving some of the most egregious conduct." *Id.* at 509. The majority seems to acknowledge that

a 3:1 ratio was the "upper limit" discussed in *Exxon* by quoting that portion of the decision. Majority at 85 (" 'the upper limit is not directed to cases *like this one* . . . ; the 3:1 ratio . . . applies to awards in *quite different* cases involving . . . malicious behavior and dangerous activity carried on for the purpose of increasing a tortfeasor's financial gain' " (second and third alterations in original) (quoting *Exxon*, 554 U.S. at 510)). The court nevertheless sustains a punitive to compensatory ratio that vastly exceeds any ratio considered palatable by the *Exxon* Court. Assuming, as the majority does, that Icicle's conduct was more blameworthy than Exxon's, a 3:1 ratio should be the "upper limit" here.[7] Accordingly, the punitive damage award should be reduced to $112,260—three times the compensatory award of $37,420.

¶47 In a footnote, the majority infers the punitive damage award in this case is no more than three times the compensatory award. Majority at 87 n.5. The court reaches this fiction by reasoning that attorney fees should be added to the compensatory side of the punitive to compensatory damages ratio. Majority at 87. In the cases cited by the majority for this proposition, the courts looked to the classification of attorney fees as compensatory under the law of the state involved. *See Blount v. Stroud*, 395 Ill. App. 3d 8, 27, 915 N.E.2d 925, 333 Ill. Dec. 854 (2009) ("In Illinois, our supreme court has recognized that the amount of attorney fees expended . . . is a relevant consideration to factor into the side of the ratio that quantifies the amount necessary to make the plaintiff whole." (citations omit-

---

[7] The majority's conclusion that Icicle's conduct was more reprehensible than Exxon's is certainly debatable. Majority at 85. Exxon's conduct led to harm that was exponentially more devastating than Icicle's wrongful withholding of maintenance and cure from one individual. Over 32,000 plaintiffs were involved in the *Exxon* class action. 554 U.S. at 479. The oil spill stripped them of their livelihoods. *Id.* While the jury found Exxon reckless, it did not have the opportunity to consider the possibility of any degree of fault beyond recklessness. *Id.* at 480 n.2. Given the evidence presented, "[t]he jury could reasonably have believed that Exxon knowingly allowed a relapsed alcoholic repeatedly to pilot a vessel filled with millions of gallons of oil through waters that provided the livelihood for the many plaintiffs." *Id.* at 525 (Breyer, J., dissenting in part).

ted)); *Action Marine, Inc. v. Cont'l Carbon, Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007) ("In Georgia, awards of attorney fees in tort cases involving bad faith are compensatory in nature."); *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 237 (3d Cir. 2005) (" 'The obvious design of the Pennsylvania statute is, first, to place [plaintiffs] in the same economic position they would have been in had the insurer performed as promised, by awarding attorney's fees as additional damages.' " (alteration in original) (quoting *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 236 (3d Cir. 1997))). But, the classification of attorney fees as compensatory in other jurisdictions is not controlling where a case is governed exclusively by federal maritime law.

¶48 Moreover, the attorney fees awarded in *Blount* under 42 U.S.C. section 1988 were specifically classified by the court as " 'remedial' " rather than punitive in nature. 395 Ill. App. 3d at 28 (quoting *Williams v. City of Fairburn*, 702 F.2d 973, 976 (11th Cir. 1983)). Section 1988 does not require a showing of a particular type of blameworthiness before attorney fees may be recovered. *See* 42 U.S.C. § 1988(b) ("the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs").

¶49 In contrast, attorney fee awards in maintenance and cure actions are characterized as punitive because fees are not available unless a showing of callous or willful and wanton conduct is made. *See Vaughan v. Atkinson*, 369 U.S. 527, 530-31, 82 S. Ct. 997, 8 L. Ed. 2d 88 (1962) (assessing an award of attorney fees against a shipowner due to "callous" attitude, "recalcitrance," and "willful and persistent" failure to pay its maintenance and cure obligations). In a recent maintenance and cure case, *Atlantic Sounding Co. v. Townsend*, the United States Supreme Court described attorney fees in this context as punitive in nature:

[O]ur case law also supports the view that punitive damages awards, in particular, remain available in maintenance and cure actions . . . . In *Vaughan* v. *Atkinson*, 369 U. S. 527 (1962),

for example, the Court permitted the recovery of attorney's fees for the "callous" and "willful and persistent" refusal to pay maintenance and cure.

557 U.S. 404, 417, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009); *see also Kraljic v. Berman Enters., Inc.*, 575 F.2d 412, 414 (2d Cir. 1978) ("We conclude therefore that the majority in [*Vaughn v.*] *Atkinson* . . . was in fact awarding counsel fees as punitive damages. . . . Recovery of such fees is therefore based upon the traditional theory of punitive damages.").

¶50 Construing the attorney fee award in this case as punitive is also supported by the majority's interpretation of the award as an "exception to the American rule that parties bear their own costs and fees in litigation." Majority at 79. Fees awarded under this exception to the American rule have been classified as punitive by the United States Supreme Court. *Hall v. Cole*, 412 U.S. 1, 5, 93 S. Ct. 1943, 36 L. Ed. 2d 702 (1973) ("[A] federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' . . . [T]he underlying rationale of 'fee shifting' is, of course, punitive." (citations omitted) (quoting 6 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE ¶54.77 [2], at 1709 (2d ed. 1972))); *see also Shimman v. Int'l Union of Operating Eng'rs*, 744 F.2d 1226, 1232 n.9 (6th Cir. 1984) ("Fees awarded under the bad faith exception [to the American rule] are punitive in nature."). Where an award of attorney fees "includes a certain punitive element," the fee award supports a lower punitive to compensatory ratio as punishment has already been partially imposed in the form of attorney fees. *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 164 (S.D.N.Y. 2003). In such cases, attorney fees are not considered part of the compensatory award. *Laymon v. Lobby House, Inc.*, 613 F. Supp. 2d 504 (D. Del. 2009).

¶51 Properly disregarding the attorney fee award, the punitive award of $1.3 million is nearly 35 times the compensatory award of $37,420. This punitive award is plainly excessive in relation to the actual harm caused by

the defendant.[8] By upholding the award, this court perpetuates a problem the *Exxon* Court intended to remedy: the issue of unpredictable punitive damage awards that fail the fundamental goal of deterrence. I would hold the punitive damage award must be reduced to conform to federal maritime law as articulated in *Exxon*. Therefore, I respectfully dissent.

ALEXANDER, J. PRO TEM., concurs with J.M. JOHNSON, J.

---

[8] The jury found that Icicle's failure to pay maintenance and cure, although willful, caused no harm to Clausen beyond the amount of maintenance and cure in arrears.