**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 16, 2020

*Steere, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 16, 2020

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Petitioner/Cross-Respondent, | ) | No. 96604-4 |
| | ) | |
| v. | ) | |
| | ) | En Banc |
| GROCERY MANUFACTURERS | ) | |
| ASSOCIATION, | ) | |
| | ) | Filed: April 16, 2020 |
| Respondent/Cross-Petitioner. | ) | |
| _____ | ) | |
| | ) | |
| GROCERY MANUFACTURERS | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Respondent/Cross-Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT W. FERGUSON, Attorney | ) | |
| General of the State of Washington, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Petitioner/Cross-Respondent. | ) | |
| _____ | ) | |

YU, J.— This case concerns alleged intentional violations of Washington's Fair Campaign Practices Act (FCPA), ch. 42.17A RCW, by the Grocery Manufacturers Association (GMA) during the 2013 election cycle. In November 2013, Washington voters rejected Initiative 522 (I-522), which would have required labels on packaged foods containing genetically modified organisms (GMOs). GMA opposes state-level GMO labeling laws, including I-522.

Over the course of the 2013 election cycle, GMA solicited over $14 million in optional contributions from its member companies, $11 million of which went to support the "No on 522" political committee. The payments to No on 522 were attributed solely to GMA itself, with no indication of which companies had provided the funds. Prior to the initiation of this lawsuit, GMA was not registered as a political committee and did not make any reports to the Public Disclosure Commission (PDC).

The State filed a complaint alleging that GMA intentionally violated the FCPA's registration and disclosure requirements and the FCPA's prohibition on concealing the sources of election-related spending. GMA countered that it cannot be subject to the FCPA's registration and disclosure requirements because those requirements violate the First Amendment as applied. U.S. CONST. amend. I. The trial court agreed with the State, imposed a $6 million base penalty on GMA, and trebled the penalty to $18 million after determining that GMA's violations were

intentional.  The Court of Appeals largely affirmed, but it reversed the treble

penalty, holding that one must "subjectively intend to violate the law in order to be

subject to treble damages."  *State v. Grocery Mfrs. Ass'n*, 5 Wn. App. 2d 169, 209,

425 P.3d 927 (2018).

We affirm that GMA violated the FCPA and that the FCPA is constitutional

as applied, but we reverse the Court of Appeals on the treble penalty issue and hold

that the trial court applied the proper legal standard to determine that GMA

intentionally violated the FCPA.  We therefore remand to the Court of Appeals to

consider GMA's claim that the penalty imposed in this case violates the excessive

fines clauses of the federal and state constitutions.  U.S. CONST. amend. VIII;

WASH. CONST. art. I, § 14.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.     Factual background

In 2012, California voters rejected a ballot proposition (Prop 37) that would

have required GMO labels on packaged foods.  GMA and its member companies

spent nearly $22 million dollars on the campaign opposing Prop 37, and some of

GMA's staff and member companies were threatened and boycotted as a result.

Following its experience in California, GMA intended to continue opposing state-

level GMO labeling laws throughout the country, but GMA's board of directors

(Board) "expressed a preference for GMA only to be identified as the funder of

efforts to oppose state labeling efforts" in the future. Clerk's Papers (CP) at 4056. At their January 2013 meeting, board members were advised "that GMA had developed a way to do this while shielding individual member companies from public scrutiny." *Id.* at 4055. GMA's proposal was to create a segregated fund called the "Defense of Brands" (DOB) account.

The DOB account was "expected and intended" to "(1) solicit, receive and hold contributions from specific GMA members (most of whom held a place on the GMA Board), (2) address the GMO strategy work nationwide and, (3) also specifically oppose Initiative 522 in Washington State." *Id.* at 4059. Two specific reasons for using the DOB account to accomplish these purposes were to "shield the contributions made from GMA members from public scrutiny" and to "eliminate the requirement and need to publicly disclose GMA members' contributions on state campaign finance disclosure reports." *Id.* The Board held a final vote approving the DOB account at its February 28, 2013 meeting.

The DOB account was not funded by GMA's ordinary member dues. Instead, it was funded by optional contributions from some of GMA's member companies, most of which had a seat on the Board. GMA members were regularly updated on the campaign opposing I-522 and "GMA members who contributed to the Defense of Brands Account were informed when their contributions were going to be transferred from the Defense of Brands Account to the No on 522 campaign."

*Id.* at 4061. Contributing GMA members were also given "information on how to respond if they received media or other inquiries" about GMA's contributions to No on 522, "in part to divert attention from the true source of the funds, namely, the individual GMA members." *Id.*

In total, GMA collected over $14 million for the DOB account in 2013, and it contributed $11 million of that amount to the No on 522 political committee. Before this lawsuit was initiated, GMA did not register with the PDC as a political committee, did not submit finance disclosure reports, did not disclose which of its members contributed to the DOB account, and did not report its contributions or expenditures.

B.     Procedural history

On October 16, 2013, the State filed a complaint alleging that GMA had failed to comply with the FCPA's registration and disclosure requirements for political committees and had concealed the true source of its contributions. The next day, GMA registered as a political committee and began filing reports with the PDC "in excess of caution." *Id.* at 37.

After I-522 was rejected by the voters in November, the State filed an amended complaint and requested that the court impose a civil fine on GMA, award the State its costs and attorney fees, and treble the judgment pursuant to former RCW 42.17A.765(5) (2010), *recodified as* RCW 42.17A.780. GMA filed

an answer and counterclaim seeking a declaratory judgment that the FCPA's requirements violate the First Amendment as applied. GMA also filed a separate lawsuit against the attorney general pursuant to 42 U.S.C. § 1983, and the two cases were consolidated.

On cross motions for summary judgment, the trial court ruled that GMA had violated the FCPA and that the FCPA is constitutional as applied to GMA. GMA's violations included

a. Failing to timely register with the Public Disclosure Commission as a political committee in violation of RCW 42.17A.205;
b. Failing to timely identify a treasurer and [bank] account in violation of RCW 42.17A.205;
c. Failing to timely and regularly disclose contributions it received from its members in the Defense of Brands Account in violation of RCW 42.17A.235;
d. Failing to timely and regularly disclose expenditures it made from the Defense of Brands Account in violation of RCW 42.17A.240;[1] and
e. Concealing the true sources of the contributions it received and expenditures it made in opposing Initiative 522.

*Id.* at 3339.

The court reserved for trial the issues of "whether GMA intentionally violated the law and if so, whether the judgment in this case should be trebled as punitive damages as allowed under [former] RCW 42.17A.765(5)." *Id.* at 3340. The court also issued a pretrial ruling that for purposes of determining whether an

---

[1] Following trial, the court clarified that GMA's failure to disclose both its contributions and expenditures violated both RCW 42.17A.235 and .240. CP at 4071.

FCPA violation is intentional, the relevant question is "whether the person acted with the purpose of accomplishing an illegal act under RCW 42.17A." *Id.* at 3684. Therefore, an intentional violation "is not limited to only those instances where the person subjectively knew their actions were illegal and acted anyway." *Id.* Following the bench trial, the court found that "it is not credible that GMA executives believed that shielding GMA's members as the true source of contributions to GMA's Defense of Brands Account was legal" and concluded "that GMA intentionally violated Washington State public campaign finance laws." *Id.* at 4068, 4072.

As to damages, the State requested a base penalty of $14,622,820, trebled to $43,868,460. The court found mitigating factors favoring a smaller penalty, including "lack of any prior violations by GMA, that GMA is not a repeat violator and that GMA cooperated with the PDC once this case was filed." *Id.* at 4069. However, the court also found aggravating factors, including

> violation of the public's right to know the identity of those contributing to campaigns for or against ballot title measures on issues of concern to the public, the sophistication and experience of GMA executives, the failure of GMA executives to provide complete information to their attorneys, the intent of GMA to withhold from the public the true source of its contributors against Initiative 522, the large amount of funds not reported, the large number of reports filed either late or not at all, and the lateness of the eventual reporting just shortly before the 2013 election.

*Id.* The court imposed a $6 million civil penalty against GMA and trebled the penalty to $18 million. The judgment was entered on December 2, 2016, with the State's attorney fees and costs left to be determined. On January 12, 2017, GMA moved to reduce the judgment, contending that it was an unconstitutional excessive fine. The court denied this motion.

On GMA's appeal, the Court of Appeals affirmed on all issues except the treble penalty, holding "that a party must have knowledge that it was violating the law to be subject to treble damages." *Grocery Mfrs. Ass'n*, 5 Wn. App. 2d at 209. The Court of Appeals therefore reversed and remanded the penalty without reaching the excessive fines issue. *Id.* at 177 n.2. Both parties filed petitions for review, which we granted. Order, No. 96604-4 (Wash. Apr. 3, 2019).

## ISSUES

A.      Was GMA a political committee during the 2013 election cycle?

B.      Are the FCPA's political committee requirements constitutional as applied?

C.      Did GMA violate the FCPA's prohibition on concealment?

D.      Did the Court of Appeals properly reverse the treble penalty?

E.      Is the penalty in this case an unconstitutional excessive fine?

F.      Is either party entitled to attorney fees on review?

ANALYSIS

A.     GMA was a political committee during the 2013 election cycle, regardless of whether one of its primary purposes was opposing I-522

GMA contends that it was not required to comply with the FCPA's registration and disclosure requirements for political committees during the 2013 election cycle because it was not a political committee during that time.  It is GMA's position that an entity cannot be a political committee unless it has a primary purpose of supporting or opposing political candidates or ballot measures. The State, meanwhile, contends that this "primary purpose requirement" does not apply in this case because GMA became a political committee based on the contributions it received or expected to receive, not the expenditures it made or expected to make.  The Court of Appeals agreed with the State, and we affirm.

1.     Background on the FCPA and political committees

The FCPA was enacted and amended by voter initiative.  LAWS OF 1973, ch. 1; LAWS OF 1993, ch. 2; *Voters Educ. Comm. v. Pub. Disclosure Comm'n*, 161 Wn.2d 470, 479-80, 166 P.3d 1174 (2007).  One of the key policies underlying the FCPA is "[t]hat political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided."  RCW 42.17A.001(1).  The FCPA "shall be liberally construed to promote complete disclosure of all information respecting the financing of political campaigns and lobbying." *Id.* at (11).

Primarily at issue in this case are the FCPA's registration and disclosure requirements for political committees. A "political committee" is defined as "any person (except a candidate or an individual dealing with the candidate's or individual's own funds or property) having the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition." RCW 42.17A.005(40). "Person" is broadly defined to include "an individual, partnership, joint venture, public or private corporation, association, federal, state, or local governmental entity or agency however constituted, candidate, committee, political committee, political party, executive committee thereof, or any other organization or group of persons, however organized." *Id.* at (38).

Status as a political committee is not necessarily fixed over time; a preexisting organization may become a political committee during a particular election cycle and cease to be a political committee when the election cycle ends. *See Utter ex rel. State v. Bldg. Indus. Ass'n of Wash.*, 182 Wn.2d 398, 413, 341 P.3d 953 (2015). When an entity does become a political committee, it "is required to file a statement of organization with the PDC and make a variety of detailed disclosures." *Id.* at 413 (citation omitted) (citing RCW 42.17A.205(1), .235). These disclosures are posted on the PDC's website, which "'enables the

public to "follow the money" with respect to campaigns and lobbying.'" *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 997 (9th Cir. 2010).

There are two ways in which an entity may become a political committee: "'by either (1) expecting to receive or receiving contributions, or (2) expecting to make or making expenditures to further electoral political goals.'" *Utter*, 182 Wn.2d at 415 (quoting *State ex rel. Evergreen Freedom Found. v. Wash. Educ. Ass'n*, 111 Wn. App. 586, 598, 49 P.3d 894 (2002) (*WEA*)). These two alternative methods of becoming a political committee are generally referred to as the "contribution prong" and the "expenditure prong," respectively. *Id.* at 416.

The expenditure prong "has been narrowed by judicial construction to cover only an organization that has as its 'primary or one of the primary purposes' to 'affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions.'" *Human Life*, 624 F.3d at 997 (quoting *WEA*, 111 Wn. App. at 599). This primary purpose requirement is not based on any statutory language. *Utter*, 182 Wn.2d at 423. Instead, it was added by this court to reflect "the spirit or intention of the law" and to ensure that the expenditure prong does not violate the First Amendment by sweeping too broadly. *State v. (1972) Dan J. Evans Campaign Comm.*, 86 Wn.2d 503, 508, 546 P.2d 75 (1976); *Utter*, 182 Wn.2d at 423, 427. To satisfy the primary purpose requirement, the State need only show that "*a* primary purpose of the entity [is] the support or

opposition of a 'candidate or . . . ballot proposition,' as opposed to *the* primary purpose of that entity." *Utter*, 182 Wn.2d at 424 (second alteration in original) (quoting former RCW 42.17A.005(37) (2011)).

The contribution prong has also been narrowed by judicial construction, but in a different way. Instead of the primary purpose requirement, courts have adopted a "segregated funds requirement." The segregated funds requirement applies to organizations, like GMA, that are "funded primarily by membership dues." *WEA*, 111 Wn. App. at 602. Such organizations become political committees pursuant to the contribution prong only if "the members are called upon to make payments that are segregated for political purposes and the members know, or reasonably should know, of this political use." *Id.*; *see also Human Life*, 624 F.3d at 1020-21.

GMA now contends that we must further narrow the contribution prong by adding the primary purpose requirement. This is an issue of first impression that depends on statutory interpretation and constitutional law and is therefore reviewed de novo. *State v. Evergreen Freedom Found.*, 192 Wn.2d 782, 789, 432 P.3d 805, *cert. denied*, 139 S. Ct. 2647, 204 L. Ed. 2d 284 (2019) (*EFF*).

2. We decline to add the primary purpose requirement to the contribution prong

GMA contends that without the primary purpose requirement, the contribution prong allows any entity "to be swept up by the FCPA" upon the

12

"receipt of any funds that could potentially be spent in elections."  GMA's Pet. for Review at 14.  Such a broad sweep, GMA contends, would unnecessarily chill political speech in violation of the First Amendment.  However, GMA fails to account for the plain language of the FCPA and the fact that the contribution prong has already been narrowed by the segregated funds requirement.  Further narrowing the contribution prong by adding the primary purpose requirement would require us to rewrite the statute in a manner that is not required by the First Amendment, and we decline to do so.

By the FCPA's plain language, the contribution prong does not apply any time an organization receives any funds that could *potentially* be spent in elections. It applies when an entity has "the *expectation* of receiving contributions" to be spent in elections.  RCW 42.17A.005(40) (emphasis added).  Potentiality is not the same as expectation, according to the ordinary meaning of those words.  *See Human Life*, 624 F.3d at 1020 ("Human Life argues that the word 'expectation' is unconstitutionally vague, as it could be interpreted to mean anything from a 'hope' to a 'contract.' We disagree.").

Moreover, to the extent that the contribution prong could be read as broadly as GMA suggests, such a reading has been foreclosed by precedent providing "concrete, discernible criteria necessary to prevent arbitrary and discriminatory enforcement," namely, the segregated funds requirement.  *Id.* at 1021.  The

13

segregated funds requirement has been an established component of the

contribution prong since at least 2002, when the Court of Appeals adopted it in a

published opinion and this court denied review. *WEA*, 111 Wn. App. at 602-03,

*review denied*, 148 Wn.2d 1020 (2003).

Thus, contrary to GMA's assertions, when an organization collects member

dues to fund general operations, the mere fact that some of that money "could

potentially be spent in elections" does *not* automatically make the organization a

political committee. GMA's Pet. for Review at 14. The organization becomes a

political committee only "if the members are called upon to make payments that

are segregated for political purposes *and* the members know, or reasonably should

know, of this political use." *WEA*, 111 Wn. App. at 602 (emphasis added); *see*

*also Human Life*, 624 F.3d at 1020-21. GMA does not explain how the

contribution prong thus narrowed has an unconstitutionally broad sweep.[2]

GMA nevertheless contends that "[a]ll 'expenditures' were once

'contributions' under the definition of 'political committee,'" so both prongs must

be narrowed in the same way, by the primary purpose requirement. GMA's Pet.

---

[2] Amicus Institute for Free Speech contends that in place of the segregated funds requirement, we should adopt a more stringent "earmarking requirement," which would require "'only disclos[ure of] those donors who have specifically earmarked their contributions for electioneering purposes.'" Br. of Amicus Curiae Inst. for Free Speech at 17-18 (alteration in original) (quoting *Indep. Inst. v. Williams*, 812 F.3d 787, 797 (10th Cir. 2016)). We decline to address this argument because it is raised on review only by amicus. *See City of Seattle v. Evans*, 184 Wn.2d 856, 861 n.5, 366 P.3d 906 (2015).

14

for Review at 15.  According to GMA, the only reason courts have never before

applied the primary purpose requirement to the contribution prong is "due to

happenstance."  *Id.* at 18.  Neither assertion is true.

First, not all expenditures were once contributions.  For example, if an entity

receives membership dues to fund its general operations and its members do not

and should not know the funds will be used for political purposes, then the entity

has not received any "contributions."  *See WEA*, 111 Wn. App. at 603.  If the entity

later adopts a primary purpose of supporting or opposing a candidate or ballot

measure during a particular election cycle and chooses to spend previously

collected dues for that purpose, then the entity has made "expenditures."  *See*

*Utter*, 182 Wn.2d at 427-28.

Second, the different narrowing requirements for the expenditure and

contribution prongs are not the products of happenstance.  Instead, both the

primary purpose requirement and the segregated funds requirement were adopted

deliberately, first by the attorney general's office and later by Washington courts in

published appellate decisions.  *Dan J. Evans*, 86 Wn.2d at 509 (citing 1973 Op.

Att'y Gen. No. 14); *WEA*, 111 Wn. App. at 602-03 (citing 1973 Letter Op. Att'y

Gen. No. 114, at 4-5).  These narrowing requirements are intentionally different

from each other because they apply in different contexts.

The primary purpose requirement came first, in response to the question, "If a corporation or similar association or organization makes a contribution to a political committee or candidate, does it thereby itself become a political committee as defined in [former] RCW 42.17.020(22) [(1973)]?" 1973 Op. Att'y Gen. No. 14, at 24. Because this question asked only about becoming a political committee pursuant to the expenditure prong, the attorney general crafted the primary purpose requirement to apply in that context. *Id.* at 26.

Later that year, the attorney general was asked whether three specific organizations qualified as political committees. Two of the organizations collected regular membership dues for general operations, which they did not set aside for political purposes but did occasionally use to "'make nominal financial contributions directly to individual candidates'" without the specific knowledge or approval of their members. 1973 Letter Op. Att'y Gen. No. 114, at 2-3. The third organization segregated some of its membership dues into a "'Legislative Fund,'" which the members knew would be used, in part, to "'make nominal contributions to the candidates' campaign fund.'" *Id.* at 2.

The attorney general's letter opinion explicitly acknowledged its earlier formal opinion and chose to "adhere at this time to that conclusion," making it unnecessary to determine whether the organizations were political committees pursuant to the expenditure prong. *Id.* at 5. The letter opinion therefore addressed

only whether any of the organizations were political committees pursuant to the contribution prong, and set forth the segregated funds requirement that was eventually adopted in *WEA*:

> If the only revenues of such groups as you have described are dues and/or assessments to fund the general operations of the organization, and no portion of these revenues are set aside, with the actual or constructive knowledge of the contributors, for use in supporting or opposing political candidates or ballot propositions, then the organization is not to be deemed a "political committee" as defined in [former] RCW 42.17.020(22), supra. If on the other hand—either as a part of their regular dues or in addition thereto—the members of such an organization are called upon to make payments to it which are thus segregated and used for those purposes under circumstances whereby the contributors know (or should know, if reasonably observant) of that practice, then those payments will in our judgment be "contributions" within the meaning of that statutory definition and the organization, hence, will be a political committee as therein defined.

*Id.* Applying this test and based on the information provided, the letter opinion concluded that the first two organizations described above were not political committees pursuant to the contribution prong, but the third one was. *Id.* at 5-6.

Thus, the attorney general clearly recognized that the expenditure and contribution prongs must both be narrowed by "*some* 'purpose' test." *Utter*, 182 Wn.2d at 423. However, rather than applying the same test to each prong, the attorney general set forth two different tests, each appropriately tailored to the context in which it applies. The expenditure prong focuses on money spent *by* the entity, so the primary purpose requirement properly considers the *entity's* purposes

17

at the time of the expenditure. Meanwhile, the contribution prong focuses on money given *to* the entity, so the segregated funds requirement properly considers the *contributors'* purposes at the time of the contributions, based on what they knew (or should have known) would be done with their money.

Both of the narrowing tests set forth by the attorney general's office have long since been adopted by Washington appellate courts. *Dan J. Evans*, 86 Wn.2d at 509; *WEA*, 111 Wn. App. at 602-03. Thus, both the expenditure prong and the contribution prong have already been narrowed so as to avoid First Amendment concerns. GMA does not show that the contribution prong must be further narrowed by adding the primary purpose requirement. We therefore affirm that during the 2013 election cycle, GMA was a political committee pursuant to the contribution prong as narrowed by the segregated funds requirement.

B.     The FCPA's registration and disclosure requirements do not violate the First
        Amendment as applied to GMA

GMA next argues that if it was a political committee during the 2013 election cycle, then the FCPA's registration and disclosure requirements for political committees violate the First Amendment as applied. The constitutionality of a statute is a question of law that we review de novo. *EFF*, 192 Wn.2d at 789. We affirm that the FCPA is constitutional as applied to GMA.

"Unlike the overall limitations on contributions and expenditures, the disclosure requirements impose no ceiling on campaign-related activities."

*Buckley v. Valeo*, 424 U.S. 1, 64, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976) (per curiam). Nevertheless, "compelled disclosure may encroach on First Amendment rights by infringing on the privacy of association and belief." *Voters Educ. Comm.*, 161 Wn.2d at 482. Therefore, the FCPA's registration and disclosure requirements for political committees are subject, not to strict scrutiny, but to "'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366-67, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) (quoting *Buckley*, 424 U.S. at 64, 66).[3] It has already been held that the FCPA's registration and disclosure requirements for political committees survive exacting scrutiny on their face "because the [FCPA]'s somewhat modest political committee disclosure requirements are substantially related to the government's interest in informing the electorate." *Human Life*, 624 F.3d at 1014.

In this case, GMA contends the FCPA's registration and disclosure requirements for political committees are unconstitutional as applied for two reasons. First, GMA contends the State has not shown a sufficiently important interest because it did not prove that voters would have benefited from knowing

---

[3] *Citizens United* is a plurality opinion, but the portion of the lead opinion that discusses disclosure laws (Part IV), 558 U.S. at 366-71, was joined by eight justices. *See id.* at 396 (Stevens, J., concurring in part and dissenting in part), 480 (Thomas, J., concurring in part and dissenting in part).

which GMA member companies contributed to the DOB account. Second, GMA contends that any interest the State does have is outweighed by the burden that the FCPA's requirements impose on the free speech and association rights of GMA's member companies. We reject both arguments. The former does not account for the public's right to know the sources of campaign funding and the latter is not supported by the record.

1.    The State has a sufficiently important interest in applying the FCPA's requirements for political committees to GMA

First, GMA contends that in an as-applied challenge, the State cannot show a sufficiently important interest by pointing to its general "interest in 'provid[ing] the electorate with information' about the sources of election-related spending." *Citizens United*, 558 U.S. at 367 (alteration in original) (quoting *Buckley*, 424 U.S. at 66). Instead, GMA argues, the State must "*demonstrate with evidence*" that applying the FCPA's political committee requirements to GMA "would have enhanced the electoral process" in the specific context of I-522. GMA's Pet. for Review at 8 (boldface omitted). The implication is that the sources of campaign-related funding are subject to compelled disclosure only on a need-to-know basis. We cannot agree.

GMA fails to recognize "that the right to receive information is the fundamental counterpart of the right of free speech." *Fritz v. Gorton*, 83 Wn.2d 275, 296, 517 P.2d 911 (1974) (plurality opinion). GMA and its member

20

companies are not the only ones with First Amendment rights at stake; the public, acting as legislators on ballot propositions such as I-522, has the right to know who is lobbying for their votes. *Human Life*, 624 F.3d at 1006-07; *EFF*, 192 Wn.2d at 799-800. As such, courts have repeatedly recognized a sufficiently important government interest in as-applied challenges to campaign finance disclosure laws without requiring specific evidence of how the voters would have made use of additional information in the context of a particular election. *E.g.*, *Citizens United*, 558 U.S. at 366-71; *Buckley*, 424 U.S. at 66-67; *EFF*, 192 Wn.2d at 799-801.

There are circumstances in which the government's interest in providing information to voters through compelled disclosure is diminished, but those circumstances are not present here. For instance, "the governmental interest in disclosure is diminished when the contribution in question is made to a minor party with little chance of winning an election." *Buckley*, 424 U.S. at 70. In addition, the government has a diminished interest where the information at issue is the names and home addresses of individuals distributing political leaflets or collecting petition signatures. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348-39, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995); *(WIN) Wash. Initiatives Now v. Rippie*, 213 F.3d 1132, 1139 (9th Cir. 2000). GMA is not a minor political party with little chance of winning, and there is no contention that requiring GMA to comply with

21

the FCPA's registration and disclosure requirements for political committees would compel disclosure of personal information about individuals.

Therefore, if applying the FCPA's registration and disclosure requirements for political committees to GMA would have provided voters with additional information about the source of funding in opposition to I-522, then the government's interest in compelling disclosure of that information is sufficient. It is clear in this case that more information would have been provided to the voters if GMA had complied with the FCPA's political committee requirements.

It is true, as GMA points out, that all of its contributions to the No on 522 political committee were publicly attributed to GMA and the name "Grocery Manufacturers Association" is not inherently misleading. However, the voters were not informed that of GMA's over 300 member companies in 2013, fewer than 40 contributed to the DOB account. The identity of the specific companies that contributed is precisely the type of information that campaign finance disclosure laws are designed to "ferret out," and the State has an important interest in giving voters access to that information. *Dan J. Evans*, 86 Wn.2d at 508.

    2.    The State's interest is not outweighed by burdens on the free speech and association rights of GMA's contributing member companies

While the State's interest in disclosure is ordinarily sufficient to survive exacting scrutiny, in certain situations "compelled disclosures may impose an unconstitutional burden on the freedom to associate in support of a particular

cause." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 198, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003), *overruled in part on other grounds by Citizens United*, 558 U.S. at 365-66. Therefore, "as-applied challenges would be available if a group could show a 'reasonable probability' that disclosure of its contributors' names 'will subject them to threats, harassment, or reprisals from either Government officials or private parties.'" *Citizens United*, 558 U.S. at 367 (internal quotation marks omitted) (quoting *McConnell*, 540 U.S. at 198). Here, GMA contends that requiring it to disclose which of its member companies contributed to the DOB account would unconstitutionally subject those companies to reprisals.[4]

There is no fixed test for determining what constitutes sufficient evidence to establish a reasonable probability of reprisals, but controlling precedent provides useful examples. In 1958, the United States Supreme Court held that the Alabama chapter of the National Association for the Advancement of Colored People could not be forced to disclose its full membership list because it had made "an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of

---

[4] Amicus SEIU 775 suggests that the FCPA's registration and disclosure requirements are unduly burdensome because they require disclosure of "[e]ach and every expenditure (not only those that go toward electoral political activity)." Br. of Amicus Curiae SEIU 775 at 8. However, the FCPA requires disclosure only of "contributions received and expenditures made *as a political committee*." RCW 42.17A.235(1) (emphasis added).

employment, threat of physical coercion, and other manifestations of public hostility." *Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449, 462, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958) (*NAACP*). Likewise, the Court held in 1982 that the Ohio chapter of the Socialist Workers Party (SWP) could not be forced to disclose its contributions and expenditures based on evidence of "threatening phone calls and hate mail, the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office," as well as "'massive'" surveillance by the Federal Bureau of Investigation and other government agencies. *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 99-100, 103 S. Ct. 416, 74 L. Ed. 2d 250 (1982).

Meanwhile, the Court held that "any serious infringement on First Amendment rights brought about by the compelled disclosure of contributors is highly speculative," and thus insufficient to outweigh the government's interest in disclosure, where the only evidence consisted of "testimony of several minor-party officials that one or two persons refused to make contributions because of the possibility of disclosure." *Buckley*, 424 U.S. at 70, 72.  Similarly, in *Citizens United*, the Court rejected claims of "recent events in which donors to certain causes were blacklisted, threatened, or otherwise targeted for retaliation" because

"Citizens United has been disclosing its donors for years and has identified no instance of harassment or retaliation." 558 U.S. at 370.

In this case, GMA relies on testimony by its president, Pamela Bailey, about the experiences of GMA and its member companies when they opposed Prop 37 in California, experiences that Bailey described as a "witch hunt." CP at 2360. In California, the GMA member companies that contributed to the opposition to Prop 37 were publicly identified, but Bailey's testimony primarily discusses reprisals faced by GMA itself and by member companies that did *not* contribute. In other words, there is no apparent causal link between the disclosure and the reprisals. Therefore, most of Bailey's testimony has little relevance to the question presented: whether requiring GMA to comply with the FCPA's reporting and disclosure requirements for political committees would expose GMA's contributing member companies to reprisals. The relevant evidence GMA does present is insufficient to outweigh the State's interest in disclosure.

First, Bailey testified that GMA and some of its staff were subjected to "death threats," "pickets," and "spray paint on the buildings."[5] *Id.* at 1540, 1543-44. Exempting GMA from the FCPA's registration and disclosure requirements

---

[5] Several briefs state that GMA's member companies were the ones subjected to death threats. *E.g.*, Suppl. Br. of GMA at 3; GMA's Pet. for Review at 10; Amicus Curiae Br. of Nat'l Ass'n of Mfrs. at 2. However, the evidence in the record is that the death threats were directed at GMA or Bailey. CP at 547 n.3, 885, 1540, 1776, 2348. There is no evidence of death threats directed at GMA's member companies and, while the trial court acknowledged that there were death threats, it did not specify to whom those threats were directed. *Id.* at 3337.

for political committees would not affect the likelihood of such reprisals in Washington because the No on 522 political committee was already required to (and did) identify GMA as a major contributor. Therefore, anyone in Washington who was inclined to take reprisals against organizations that oppose GMO labeling laws would already have the information needed to target GMA itself, regardless of whether GMA was a political committee.

Next, GMA points to evidence of reprisals directed toward GMA member companies. Specifically, Bailey testified that GMA "was concerned about the smaller companies who were *not involved* in the GMO issue" but "were being harassed, were being asked to drop their membership" in GMA. *Id.* at 2361 (emphasis added), 2359. "There were certain companies that came to us and said they have to drop GMA membership because of this situation." *Id.* at 2362. This evidence is also not helpful to GMA. According to Bailey, the full GMA membership list in 2013 was already publicly available, so anyone inclined to take reprisals against a company based on its membership in GMA could do so, regardless of whether GMA was a political committee. If anything, requiring GMA to disclose which companies had contributed to the DOB account would *reduce* the likelihood that smaller companies would face reprisals because then it would be publicly known that they had not contributed.

Finally, GMA points to more generalized testimony that "[c]ompanies were picketed, their Facebook pages were taken down," that companies were "attack[ed]" "[e]very single day," and that "there are boycotts of our member companies going on today because of the GMO issue." *Id.* at 1540, 1775; 1 Verbatim Report of Proceedings (Aug. 15, 2016) at 180. It is not clear how much of this activity was directed at companies because they actually contributed funds in opposition to GMO labeling laws, as opposed to their mere membership in GMA. In any event, this evidence is insufficient to show a reasonable probability that the contributing member companies would face the type of reprisals that would require GMA's exemption from the FCPA's requirements for political committees.

Nonviolent consumer boycotts are themselves protected speech, and "[s]peech does not lose its protected character . . . simply because it may embarrass others or coerce them into action." *Nat'l Ass'n for Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982). Meanwhile, online harassment directed at a company's Facebook page is not comparable to being shot at or being subjected to massive government surveillance programs and physical coercion directed at individuals. The evidence here is thus far more similar to the evidence held insufficient in *Buckley*, 424 U.S.

at 70-72, and *Citizens United*, 558 U.S. at 370, than to the evidence that was held

sufficient in *NAACP*, 357 U.S. at 462, and *Brown*, 459 U.S. at 99-100.

Moreover, the possibility of constitutionally impermissible reprisals against

GMA's member companies appears to be an after-the-fact justification, rather than

a genuine explanation, for GMA's failure to comply with the FCPA.  The

possibility of reprisals was clearly insufficient to deter GMA from contributing to

the No on 522 committee in its own name, despite knowing that its contributions

would be publicly disclosed.  Indeed, even when this litigation had reached the

summary judgment stage, GMA made only passing references to the possibility of

reprisals as a concern, instead focusing on arguments that the FCPA "is hopelessly

vague," that disclosure would "not benefit voters," and that the FCPA "imposed

unjustifiable costs on GMA."  CP at 385.  This strongly indicates that "immunity

from state scrutiny" is not "so related to the right of the members to pursue their

lawful private interests privately and to associate freely with others in so doing"

that applying the FCPA would unduly deter the exercise of First Amendment rights

by GMA or its member companies.  *NAACP*, 357 U.S. at 466.

As amicus points out, "the harassment GMA's members experienced in

California and that GMA feared they would experience again in Washington is

typical of the kinds of threats individuals and businesses frequently endure when

their political views are disclosed."  Amicus Curiae Br. of Nat'l Ass'n of Mfrs. at

18. Therefore, if such reprisals require GMA's exemption from the FCPA's requirements, then every entity making contributions or expenditures supporting or opposing controversial candidates or ballot measures must also be exempted. Campaign finance disclosure laws will be largely nullified, despite decades of controlling precedent upholding their validity. *E.g.*, *Citizens United*, 558 U.S. at 366-71; *Buckley*, 424 U.S. at 60-84. We decline to take such a step, and therefore affirm that the FCPA is constitutional as applied to GMA.

C.     We need not decide whether the FCPA's prohibition on concealment requires independent acts intended to conceal because GMA did engage in such acts

GMA next challenges the Court of Appeals' affirmance of the trial court's ruling that GMA violated the FCPA's prohibition on concealment, RCW 42.17A.435, which provides,

> No contribution shall be made and no expenditure shall be incurred, directly or indirectly, in a fictitious name, anonymously, or by one person through an agent, relative, or other person in such a manner as to conceal the identity of the source of the contribution or in any other manner so as to effect concealment.

GMA contends that it did not violate this provision because, at most, GMA merely failed to comply with the FCPA's registration and disclosure requirements for political committees, while the concealment statute requires "an independent act intended to conceal or mislead." GMA's Pet. for Review at 19. We need not decide whether the statute contains this implied "independent act requirement"

because the undisputed evidence is that GMA did engage in acts of concealment that went beyond its failure to comply with the FCPA's registration and disclosure requirements.

GMA cites only one case, *Permanent Offense*, as an example of a case involving an independent act of concealment. Suppl. Br. of GMA at 15 (citing *State ex rel. Pub. Disclosure Comm'n v. Permanent Offense*, 136 Wn. App. 277, 150 P.3d 568 (2006)). The independent act in *Permanent Offense* was forming a corporation to provide consulting services to a political action committee. 136 Wn. App. at 280. The purpose of the corporation was to allow an individual to be paid for his work on a campaign without allowing the public to know that he was being compensated. *Id.* at 284. The Court of Appeals concluded this violated RCW 42.17A.435, holding that "there is nothing inherently unlawful about forming a corporation to provide consulting services. Rather, it is the use of the corporate form for the improper purpose of concealment that is the problem." *Id.*

GMA's creation and use of the DOB account to fund its opposition to I-522 is directly analogous to the formation and use of the corporation at issue in *Permanent Offense*. Creating the DOB account, soliciting contributions from member companies, and contributing most of that money to No on 522 were not inherently unlawful actions and did not violate the FCPA's registration and disclosure requirements. However, these actions were undertaken for the improper

30

purpose of concealment: "The undisputed evidence further shows that the GMA's intent was to create a plan to 'provide anonymity and eliminate state filing requirements for contributing members.'" CP at 3191. In addition, contributing GMA members were given "information on how to respond if they received media or other inquiries" about GMA's contributions to No on 522, "in part to divert attention from the true source of the funds, namely, the individual GMA members." *Id.* at 4061. A trade organization advising its members on communications with the media is not inherently unlawful and does not violate the FCPA's registration and disclosure requirements. However, providing advice on how to divert attention from the true source of campaign funding for the improper purpose of concealment violates RCW 42.17A.435. We therefore affirm that GMA did violate the FCPA's prohibition on concealment during the course of the 2013 election cycle.

D.    The Court of Appeals improperly elevated the showing needed to find intentional violations of the FCPA

Next, we consider the treble penalty imposed by the trial court pursuant to former RCW 42.17A.765(5) (now codified as RCW 42.17A.780), which provides in relevant part, "If the violation is found to have been intentional, the amount of the judgment, which shall for this purpose include the costs, may be trebled as punitive damages." The trial court determined that GMA's violations were intentional based on the standard set forth in its pretrial ruling: "To determine

whether a violation is intentional under RCW 42.17A.765, Washington law requires the Court to look at whether the person acted with the purpose of accomplishing an illegal act under RCW 42.17A." CP at 3684. The Court of Appeals reversed and remanded, holding that a person must "subjectively intend to violate the law in order to be subject to treble damages." *Grocery Mfrs. Ass'n*, 5 Wn. App. 2d at 209. We reverse the Court of Appeals and hold that the trial court applied the correct standard to determine that GMA's violations were intentional.

The meaning of "intentional" for purposes of the FCPA is a question of statutory interpretation that we review de novo. *EFF*, 192 Wn.2d at 789. The FCPA does not define intentional, so we should apply its "'usual and ordinary meaning'" unless the statutory context indicates otherwise or the ordinary meaning would lead to "'unlikely, absurd or strained' results." *Burton v. Lehman*, 153 Wn.2d 416, 422-23, 103 P.3d 1230 (2005) (quoting *State v. Hahn*, 83 Wn. App. 825, 832, 924 P.2d 392 (1996); *State v. Stannard*, 109 Wn.2d 29, 36, 742 P.2d 1244 (1987)). The ordinary meaning of intentional, in both civil and criminal contexts, requires intent to accomplish an unlawful act, but not subjective knowledge that the act is unlawful. *E.g.*, RCW 9A.08.010(1)(a) (defining "intent" for purposes of criminal statutes); *In re Disciplinary Proceeding Against Vanderveen*, 166 Wn.2d 594, 611, 211 P.3d 1008 (2009) (definition of intent for purposes of lawyer discipline) (quoting ABA, STANDARDS FOR IMPOSING LAWYER

SANCTIONS Definitions at 6 (1991)); *Bradley v. Am. Smelting & Ref. Co.*, 104 Wn.2d 677, 682-83, 709 P.2d 782 (1985) (discussing tort of intentional trespass) (quoting RESTATEMENT (SECOND) OF TORTS § 8A (AM. LAW INST. 1965); WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS, § 8, at 31-32 (4th ed. 1971)).

However, the Court of Appeals held that the ordinary meaning of intentional does not apply here because "former RCW 42.17A.765(5) states that the *violation* must be intentional, not that the conduct giving rise to the violation must be intentional." *Grocery Mfrs. Ass'n*, 5 Wn. App. 2d at 209. This reading conflicts with the broader statutory context, specifically "the FCPA's stated policy and express directive that its provisions be 'liberally construed to promote complete disclosure of all information respecting the financing of political campaigns.'" *EFF*, 192 Wn.2d at 794 (quoting RCW 42.17A.001(11)). Requiring subjective knowledge of illegality is clearly a narrow reading, not a liberal one.

Moreover, this narrow reading undermines the FCPA by encouraging entities to remain ignorant of the FCPA's requirements, increasing the likelihood that those requirements will not be followed. Indeed, there are indications that occurred in this case, based on the trial court's findings that "GMA voted to approve the Defense of Brands Account without ever inquiring of its attorneys whether such an account was legal under Washington law" and that when GMA did later consult attorneys, it "did not provide complete information" and failed to

respond to the attorneys' requests for further information and documentation. CP at 4068.

GMA nevertheless contends that applying the ordinary meaning of intentional to FCPA violations would mean that "punitive damages are available in virtually every case," allowing the State to selectively pursue treble damages and chill First Amendment activity by disfavored speakers.[6] Answer to State's Pet. for Review at 16. We take such concerns very seriously, but we decline to adopt GMA's proposed solution. Instead, we hold that the word intentional does have its ordinary meaning in the context of the FCPA, and we direct trial courts to use care when exercising their discretion to determine whether an intentional violation of the FCPA warrants treble damages. In doing so, we emphasize two points.

First, we emphasize that our interpretation does not make treble damages available in every case. An FCPA violation is not intentional, according to the ordinary meaning of that term, unless the violator intended to accomplish something prohibited by the FCPA. Thus, for example, if a political committee fails to timely register or file a disclosure report, but has no intention of keeping

---

[6] One of the concurring/dissenting opinions raises similar concerns. *See* concurrence/dissent (Johnson, J.) at 4-6. We express no opinion as to whether the State selectively pursued treble damages in this case, but that issue may be relevant to GMA's excessive fines claim on remand, as discussed below.

private any information that the FCPA requires to be made public, then there is no

intentional violation.

Second, we emphasize that an intentional violation is necessary, but not

sufficient, to impose treble damages. Instead, "[i]f the violation is found to have

been intentional," then the judgment "*may* be trebled as punitive damages."

Former RCW 42.17A.765(5) (emphasis added). Whether treble damages should

be imposed is thus clearly a discretionary decision for the trial court, which can be

made only after the court determines that a violation was intentional. The trial

court in this case clearly recognized this distinction because it first found that

GMA's violations were intentional, then weighed aggravating and mitigating

factors to determine the penalty that should be imposed. CP at 4068-69.

Unfortunately, the statute does not set forth the factors that should guide a

court in exercising its discretion. In this case, apart from its argument that an

intentional violation requires subjective knowledge of unlawfulness, GMA does

not otherwise contend that the trial court abused its statutory discretion by

imposing a treble penalty.[7] It would therefore be premature for this court to make

any definitive holding as to how a trial court should exercise its discretion when

imposing treble penalties. However, we note that the FCPA explicitly states that

---

[7] GMA's claim that the penalty is an unconstitutional excessive fine is discussed below.

treble penalties may be imposed "as punitive damages."[8]  Former RCW

42.17A.765(5); *see also* RCW 42.17A.780.  Therefore, a court's discretion should

be guided by factors that focus on the purposes underlying punitive damages

awards.

The question of whether punitive damages should be awarded is "[m]ost

often . . . characterized in terms of a defendant's motive or intent."  *Kolstad v. Am.

Dental Ass'n*, 527 U.S. 526, 538, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999).  This

is because "a punitive damages remedy advances the goals of punishing egregious

and willful behavior resulting in injury and punishing conduct designed and

intended to provide some financial gain to the offending party, as well as deterring

similar conduct."  *Clausen v. Icicle Seafoods, Inc.*, 174 Wn.2d 70, 84, 272 P.3d

827 (2012).  Not all intentional FCPA violations are equally egregious and willful,

and different violators may have very different reasons for acting as they did.

Therefore, each case should be assessed individually and with great care.

While not directly applicable to a court's decision on treble damages, the

penalty factors for the PDC set forth in WAC 390-37-182 provide useful

guidance.[9]  For example, if a violator *did* have subjective knowledge that its

---

[8] The FCPA thus provides the "express legislative authorization" required for punitive damages.  *Dailey v. N. Coast Life Ins. Co.*, 129 Wn.2d 572, 575, 919 P.2d 589 (1996).

[9] After the trial in this case had concluded, the legislature enacted a list of factors for courts to consider "[w]hen assessing a civil penalty," which are largely similar to the factors in WAC 390-37-182.  LAWS OF 2018, ch. 304, § 12(1)(d).  We express no opinion as to whether

conduct was unlawful and acted anyway, that would likely be a strong factor favoring treble damages so as to deter willful violations of the FCPA. *See* WAC 390-37-182(3)(e). Likewise, if the violator took steps to *avoid* gaining subjective knowledge that its conduct was unlawful, that would likely also favor treble damages so as to deter willful ignorance of, or reckless indifference to, the FCPA's requirements. *See id.* Meanwhile, if the violator made a reasonable attempt in good faith to determine whether its conduct was lawful and simply came to an honest but incorrect conclusion, treble damages are less likely to be appropriate because courts should encourage reasonable, good faith efforts to comply with the law. *See id.* at (3)(k), (n). A violator's prior history of compliance (or noncompliance) with the FCPA or similar laws in other jurisdictions may also be relevant. *See id.* at (3)(a), (m). Courts might also consider the violator's level of cooperation with the PDC after a violation is alleged, as well as the timeliness and completeness of any disclosures the violator ultimately does make. *See id.* at (3)(b), (*l*). We caution that these factors are not necessarily exclusive. *See id.* at (3)(p). However, further developments must await a case in which the issue is squarely presented.

---

these statutory factors will be binding on future courts assessing whether to *treble* a civil penalty, but they may be instructive.

With these observations, we reverse the Court of Appeals on this issue and hold that for purposes of FCPA violations, intentional has its ordinary meaning, which requires only the intent to accomplish an illegal act. The violator is not required to subjectively know that its conduct is illegal. The trial court therefore applied the correct legal standard to determine that GMA's violations were intentional.

E.      We remand GMA's excessive fines claim to the Court of Appeals

Because it reversed the treble penalty on statutory grounds, the Court of Appeals declined to reach GMA's argument that the penalty imposed in this case is an unconstitutional excessive fine. *Grocery Mfrs. Ass'n*, 5 Wn. App. 2d at 177 n.2. Because we now reverse on the treble penalty issue, we remand GMA's excessive fines claim to the Court of Appeals. RAP 13.7(b). In doing so, we caution that our affirming the trial court's statutory authority to impose a treble penalty in this case does not necessarily mean that either the base penalty or the treble penalty that was actually imposed is constitutional.

Both the Eighth Amendment to the United States Constitution and article I, section 14 of the Washington Constitution prohibit imposing "excessive fines." A fine is excessive "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998). To determine if a fine is grossly disproportional, courts

consider factors including "(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused." *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1122 (9th Cir. 2004) (citing *Bajakajian*, 524 U.S. at 337-40). Punitive fines should not be sought or imposed "to retaliate against or chill the speech of political enemies" or as "'a source of revenue.'" *Timbs v. Indiana*, 586 U.S. ___, 139 S. Ct. 682, 689, 203 L. Ed. 2d 11 (2019) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 979 n.9, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (plurality portion)).

In this case, the State requested an apparently unprecedented base penalty of $14,622,820, trebled to $43,868,460. CP at 3996. Nearly all of the requested base penalty ($14 million) was attributed to "the amount of funds that went unreported." *Id.* at 4002. This is a permitted statutory basis for determining a penalty. Former RCW 42.17A.750(1)(f) (2013). However, it will not always be constitutional as applied. *See Bajakajian*, 524 U.S. at 338-39. The trial court ultimately imposed a smaller, but still apparently unprecedented, base penalty of $6 million, trebled to $18 million. On remand, this penalty must be scrutinized carefully to ensure that it is based on constitutionally permissible considerations and is not grossly disproportional to GMA's violations of the FCPA's registration and disclosure requirements for political committees.

F.      We award the State attorney fees on review

The State requests attorney fees pursuant to former RCW 42.17A.765(5), which provides in relevant part, "In any action brought under this section, the court may award to the state all costs of investigation and trial, including reasonable attorneys' fees to be fixed by the court." *See also* RCW 42.17A.780. Because the State prevails on all of the issues presented for our determination, we exercise our discretion to award the State attorney fees on review.

GMA requests attorney fees pursuant to former RCW 42.17A.765(5) and 42 U.S.C. § 1988. Both statutes allow attorney fees only if GMA is the prevailing party. 42 U.S.C. § 1988(b); former RCW 42.17A.765(5); *see also* RCW 42.17A.780. Because GMA does not prevail on any issue before this court, it is not entitled to attorney fees on review.

## CONCLUSION

GMA asks us to significantly curtail the application of the FCPA in ways that are not required by the statutory language, relevant precedent, or the state and federal constitutions. We decline to do so. We therefore affirm that GMA violated the FCPA and that the FCPA is constitutional as applied. We further hold that the word intentional has its ordinary meaning for purposes of FCPA violations and therefore reverse the Court of Appeals in part. Finally, we remand to the Court of Appeals for consideration of GMA's excessive fines claim.

_Yu, J._

WE CONCUR:

_Stephens, C.J._

_González, J._

_Owens, J._

_Fairhurst, J.P.T._

*State v. Grocery Mfrs. Ass'n*

No. 96604-4

JOHNSON, J. (concurring/dissenting)—I agree with the majority and would affirm the FCPA violation (Fair Campaign Practices Act, ch. 42.17A RCW). Where I disagree is with the majority's statutory interpretation of former RCW 42.17A.765(5) (2010) on the applicability of the trebling provision. On this issue, I would affirm the Court of Appeals' statutory interpretation and vacate the trebled penalty. The majority remands to the Court of Appeals for resolution of the constitutional excessive fines issue, but before the constitutional claims can be addressed, the trial court must correct the penalty. The trial court erred by imposing a $6 million base penalty, trebled to $18 million, without properly considering all of the factors enumerated in Title 390 WAC, which the majority agrees should be considered. The portion of the trial court's order setting the penalty should be vacated and this case remanded for the trial court to properly apply the factors under WAC 390-37-182(1), particularly the comparability factor.

Under the majority's interpretation, essentially any violation is now subject to trebling. This interpretation of the trebling provision, former RCW

42.17A.765(5), means a trial court is granted broad discretion to impose a trebled

penalty. As the Court of Appeals recognized, the statutory language does not

support that interpretation. A narrow statutory interpretation of the trebling

provision guides the trial court's decision-making process, establishes a consistent

penalty scheme, and provides a stronger basis for review.

The purpose, plain language, and practical application of the trebling

provision require an interpretation of narrow applicability. The majority's

interpretation, adopting the "ordinary meaning of intentional," disregards the very

purpose of the provision, which is to denote when punitive damages may be

imposed.[1] Majority at 32. Punitive damages are intended to be a form of

"exceptional relief" available only upon egregious conduct, not run-of-the-mill

violations. *Dailey v. N. Coast Life Ins. Co.*, 129 Wn.2d 572, 577, 919 P.2d 589

(1996); *see Clausen v. Icicle Seafoods, Inc.*, 174 Wn.2d 70, 84, 272 P.3d 827

(2012) (discussing the United States Supreme Court's recognition that the

"punitive damages remedy advances the goals of punishing egregious and willful

behavior"). Our Washington decisions reflect a long-standing hesitance to make

---

[1] WAC 390-37-182(3)(e) contains a similar provision, which directs the Public Disclosure Commission when imposing a penalty to consider "[w]hether the noncompliance resulted from a knowing or intentional effort to conceal, deceive or mislead, or violate the law or rule, or from collusive behavior."

punitive damages available in any proceeding unless express legislative authorization exists. *Dailey*, 129 Wn.2d at 575. This indicates that the trebling provision should apply only sparingly. Consistent with this policy, the Court of Appeals here correctly reversed the trebled penalty, recognizing "[t]he plain language . . . states that the *violation* must be intentional, not that the conduct giving rise to the violation must be intentional." *State v. Grocery Mfrs. Ass'n*, 5 Wn. App. 2d 169, 209, 425 P.3d 927 (2018), *review granted*, 193 Wn.2d 1001 (2019).

The statutory language could not be more express. It provides, "If the *violation* is found to have been *intentional*, the amount of the judgment . . . may be trebled as punitive damages." Former RCW 42.17A.765(5) (emphasis added). The statute establishes separate inquiries: (1) whether a violation occurred and (2) if a violation did occur, whether it was "intentional." The statute also distinguishes between two types of violations—intentional and unintentional. Use of the word "if" is significant. It presupposes that some violations will *not* be intentional.[2]

_____

[2] Additionally, in *State ex rel. Public Disclosure Commission v. Food Democracy Action!,* the Court of Appeals noted, "The increased penalty for intentional violations suggests that the legislature contemplated unintentional conduct underlying some violations." 5 Wn. App. 2d 542, 550, 427 P.3d 699 (2018) (citing *Dailey*, 129 Wn.2d at 577).

This language signals that treble damages are appropriately reserved for only the limited subset of intentional violations.

This reading is consistent with how the FCPA has been applied in practice. Although the parties have cited many enforcement actions brought under this FCPA provision, no case exists where treble damages were imposed—until now. Yet, the majority's interpretation of the "intentional" standard erases the statutory distinction and potentially renders all violations to be intentional and subject to trebling. The statutory language does not support that reasoning, particularly where protected speech may be involved.

Based on the record before us, this case also arguably presents First Amendment concerns that should be considered in conjunction with the excessive fines claims on remand. U.S. CONST. amends. I, VIII; WASH. CONST. art. I, § 14. The conduct at issue involved advocacy for the rejection of an initiative submitted to the voters. In such a case, where the conduct entails involvement in the political process and the government punishes an aspect of that involvement, care must be exercised. The United States Supreme Court has recognized that the First Amendment "stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010). "Discrimination against speech because of its message is

4

presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995). The government cannot misuse the statutory punitive damages to target particular speakers. Where that occurs, the focus is on the impermissible chilling of political speech. While this issue was not expressly presented to or resolved by the trial court, it is of constitutional concern.

This case seems to exemplify an arbitrary and subjective selection of an organization involved in the political process. It seems troubling that in this very election, the failure to comply with the FCPA registration and reporting requirements was evidently not uncommon. As discussed in the parties' briefing, the *supporters* of the initiative, Food Democracy Action!, similarly failed to register as a political committee and file required reports. The State brought a similar enforcement action against Food Democracy, who did not appear for trial. Yet, the State did not pursue treble damages. In that case, the court assessed a total penalty of $319,281.58 plus costs and attorney fees. *State ex rel. Pub. Disclosure*

*Comm'n v. Food Democracy Action!*, 5 Wn. App. 2d 542, 547-48, 427 P.3d 699

(2018).[3]

In this case, the State's trial brief evinces a markedly different approach. The

State requested a civil penalty in excess of $43 million, and the trial court imposed

a total penalty of $18 million with costs and attorney fees, which under the

majority's view is statutorily permissible. *See* Clerk's Papers (CP) at 3454-57,

4072. The requested penalty included $600,000 for failure to file reports, $22,820

in late fees, and $14 million representing the unreported amount of contributions.

CP at 3453-54. The State also sought costs and attorney fees and requested treble

damages. In seeking this relief, the State was quite candid in disclosing its goal that

"[t]his penalty will send a *clear message* to GMA [Grocery Manufacturers

Association] and other entities." CP at 3449 (emphasis added). The State further

publicly represented that it "'took this case to trial because the GMA needed to be

held accountable for their arrogance.'"[4] Answer to State's Pet. for Review at 17.

---

[3] The Court of Appeals ultimately rejected Food Democracy's challenges to the penalties imposed, holding that the claims were waived by its failure to appear at trial. *Food Democracy*, 5 Wn. App. 2d at 553.

[4] It is worthwhile to note that the "arrogance" of a violator is irrelevant to any FCPA liability or penalty inquiry.

It is concerning that the penalty imposed in this case is an extreme outlier. In its trial brief, GMA recounts that the penalties assessed in prior FCPA violation actions ranged from $500 to $240,000.[5] Even when compared to federal campaign finance violations, the $6 million base penalty alone greatly exceeds the largest federal penalty. Notably, WAC 390-37-182(3)(o) directs consideration of "[p]enalties imposed in factually similar cases." This factor is especially significant to ensure compliance with the excessive fines clauses of the federal and state constitutions. U.S. CONST. amend. VIII; WASH. CONST. art. I, § 14. Although the trial court findings reflect it was on notice of comparable penalties, the trial court did not seem to properly consider or make a comparability calculation. *See* CP at 4069. This failure perhaps led the trial court to impose a penalty that far exceeds any other case. To correct this error, the penalty should be vacated and this case remanded for the trial court to properly consider the WAC 390-37-182(1), (3) factors and recalculate the appropriate penalty.

---

[5] GMA further identified a prior case where the State agreed to settle with a party who allegedly violated the FCPA for $975,000, which is still significantly lower than the penalty here. CP at 3484.

*State v. Grocery Mfrs. Ass'n*, No. 96604-4
(Johnson, J., concurring/dissenting)

Madsen, J.

No. 96604-4

GORDON McCLOUD, J. (concurring/dissenting)—I agree with the

majority that the Grocery Manufacturers Association (GMA) meets the statutory

definition of "political committee" under the Fair Campaign Practices Act (FCPA),

ch. 42.17A RCW. I also agree that the FCPA satisfies First Amendment

requirements as applied to GMA and the Defense of Brands (DOB) account. U.S.

CONST. amend. I. And I agree that the courts below failed to apply the Eighth

Amendment's bar on excessive fines to the huge base and trebled penalties in this

case. U.S. CONST. amend. VIII.

I write separately because the trial court based its finding that GMA

committed multiple violations on the same conduct and such double counting is

inconsistent with the statutory language and legislative intent. I would therefore

vacate the concealment violation and remand for recalculation of all penalties

without considering that one. I would also instruct the trial court to consider a

critically important factor in determining how to exercise its discretion when

1

deciding the amount of both the base penalty and the trebled fine: the Eighth

Amendment's prohibition on "excessive fines."

I therefore respectfully concur in part and dissent in part.

ANALYSIS

The State alleged that GMA filed a statement of organization as a political

committee 224 days late.  The trial court found that this failure to file for seven and

a half months violated RCW 42.17A.235(1).  The State further alleged that GMA

failed to file numerous contribution and expenditure reports required of political

committees.  The trial court found that these failures to file violated RCW

42.17A.235(1)(a).  The State also sought penalties against GMA for "concealment"

of its true funding sources.  The trial court found that this concealment violated

RCW 42.17A.435.

But the conduct amounting to "concealment" was the same as the conduct

that subjected GMA to the FCPA registration and filing requirements in the first

place.  Under settled rules of statutory interpretation, the legislature could not have

intended that result.  I would therefore hold that penalizing GMA with a separate

violation of the concealment statute in a case like this constitutes impermissible

double punishment in violation of the legislature's intent.

2

FINDING THAT GMA VIOLATED BOTH FAILURE TO REPORT AND CONCEALMENT STATUTES CONFLICTS WITH LEGISLATIVE INTENT AS EXPRESSED IN THE FCPA

> *A. When Two Statutes Penalize the Same Conduct, We Analyze Whether the Statutes Are Concurrent To Determine the Legislative Intent*

"It is a well established rule of statutory construction that 'where a special statute punishes the same conduct which is punished under a general statute, the special statute applies and the accused can be charged only under that statute.'" *State v. Shriner*, 101 Wn.2d 576, 580, 681 P.2d 237 (1984) (quoting *State v. Cann*, 92 Wn.2d 193, 197, 595 P.2d 912 (1979)). We apply this rule when the two potentially applicable statutes are "concurrent." *State v. Albarran*, 187 Wn.2d 15, 20, 383 P.3d 1037 (2016). Statutes are concurrent if "the general statute will be violated in each instance where the special statute has been violated." *Shriner*, 101 Wn.2d at 580. "It is not relevant that the special statute may contain additional elements not contained in the general statute." *Id.*

This rule of statutory interpretation preserves the legislature's intent "to give effect" to the special statute, which contains additional elements and is therefore likely harder to prove. *Id.* at 582 (quoting *State v. Danforth*, 97 Wn.2d 255, 258-59, 643 P.2d 882 (1982)). We generally apply this rule in criminal cases where the specific statute carries a lower penalty and, hence, the defendant has a greater

3

incentive to raise the issue. But the interpretive rule of respecting the legislature's intent certainly applies here.

GMA contends that the legislature did not intend to punish identical conduct under two separate statutes in this case: the FCPA reporting requirements (RCW 42.17A.235) and the FCPA concealment statute (RCW 42.17A.435). GMA's Pet. for Review at 19-20. It asserts that by finding a concealment violation without proof of additional unlawful conduct, the lower court "wrongly double-counted" GMA's failure-to-report violation and improperly exposed GMA to additional penalties. Suppl. Br. of Resp't/Pet'r GMA at 15. For the reasons discussed below, I agree.

### B. The Two Statutes at Issue Here Are Concurrent

1. Every violation of the reporting statute is also a violation of the concealment statute

As discussed above, when the legislature enacts two statutes that are "concurrent," we presume that it intended to use the specific statute to address the conduct it specifically describes. The FCPA's reporting mandate (RCW 42.17A.235) and concealment prohibition (RCW 42.17A.435) are concurrent because a violation of the first one necessarily constitutes a violation of the second one: anyone who fails to file an expenditure or contribution report also necessarily "conceals" the source of those unreported funds.

This is clear from the language of the two statutes. The FCPA reporting requirement, RCW 42.17A.235, is quite specific. It requires political committees to file financial reports that detail contributions received and expenditures made, on specific dates and at specific intervals, with the Public Disclosure Commission (PDC). RCW 42.17A.235.[1]

The concealment statute, on the other hand, covers a lot more ground than just filing forms. It forbids anyone from making a contribution or incurring an expenditure "in a fictitious name, anonymously, or by one person through an agent, relative, or other person in such a manner as to conceal the identity of the source of the contribution or in any other manner so as to effect concealment." RCW 42.17A.435.

Neither "conceal" nor "concealment" is defined in the FCPA, so we turn to their dictionary definitions. *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 451, 210 P.3d 297 (2009) (citing *Garrison v. Wash. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976)). The dictionary defines "conceal" as "prevent disclosure or recognition of," "refrain from revealing," or "place out of sight"

---

[1] The legislature has amended the reporting statute and many other FCPA provisions since the 2013 election. *See, e.g.*, LAWS OF 2019, ch. 428, § 20; LAWS OF 2015, ch. 54, § 1. At the relevant time for this case, RCW 42.17A.235 included similar reporting requirements for political committees. Former RCW 42.17A.235, .240 (2012).

among many other similar definitions.  WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY 469 (1993).

Thus, the statute prohibiting concealment, RCW 42.17A.435, forbids any

and all unspecified behavior that conceals the source of political contributions or

expenditures.  That statute's prohibition covers more than just political committees

and unfiled reports; it applies to anyone who conceals the source of political

campaign funding in any way.

These two statutes are "concurrent" because by failing to file a required

contribution and expenditure report, a political committee necessarily "conceals"

the source of its (unreported) funds.  The committee "refrain[s] from revealing" its

funding source and "prevent[s] disclosure" by failing to file with the PDC.

WEBSTER'S, *supra*, at 469.

2.  The concealment statute does not require a separate intent element

To be sure, the statutes would not be concurrent if "concealment" contained

an additional, separate intent element.  If that were the case, then unwitting

reporting violations would violate the reporting statute, but not the concealment

statute.  *See Shriner*, 101 Wn.2d at 580 (to be concurrent, the general statute must

be violated each time the specific statute is violated).

But the concealment statute standing alone contains no intent requirement.

6

This is clear, first, from the language of the concealment statute. To revisit the dictionary definition, concealment means to "prevent disclosure or recognition of" or "refrain from revealing." WEBSTER'S, *supra*, at 469. GMA prevented disclosure and refrained from revealing the source of DOB funding by inaction— failing to report its contributions and expenditures as a political committee— regardless of its intentions. Each of those separately alleged failures to report necessarily occurred "in such a manner as to conceal the identity of" its source by the very nature of being unreported. RCW 42.17A.435. The definition of "conceal" does not imply intentional conduct.

Second, this is clear from the fact that another section of the FCPA, RCW 42.17A.780, expressly requires a finding of "intent" to impose that statute's harsher penalty. Under that treble damages section, if a violation of the FCPA (including the concealment statute) "is found to have been intentional, the amount of the judgment, which shall for this purpose include the costs, may be trebled as punitive damages." RCW 42.17A.780. The damage trebling provision's express inclusion of "intent" as a prerequisite to imposing its harsher penalties strongly suggests that the legislative omission of "intent" from the RCW 42.17A.435 concealment statute means that the latter contains no intent element. *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 219, 173 P.3d 885 (2007) ("When the

7

legislature uses two different terms in the same statute, courts presume the

legislature intends the terms to have different meanings." (citing *Koenig v. City of*

*Des Moines*, 158 Wn.2d 173, 182, 142 P.3d 162 (2006))).  Otherwise every

concealment violation would automatically support treble damages, and that can't

be what the legislature intended.[2]

Third, and critically, this court has already held that the concealment statute

contains no mens rea.  The issue came up in *State v. Conte*, 159 Wn.2d 797, 154

P.3d 194 (2007).  In that case, several defendants were charged criminally with

conspiracy to violate RCW 40.16.030 for funneling campaign contributions to

Seattle City Council candidates through other people and thereby evading

campaign finance reporting requirements.  *Id.* at 801-02.  That statute makes it a

crime to "knowingly procure or offer any false or forged instrument to be filed,

registered, or recorded in any public office."  It imposes punishment up to five

years in prison or $5,000.  RCW 40.16.030.  The defendants argued that the

conduct at issue was covered by chapter 42.17A RCW (former chapter 42.17 RCW

(1972)), and that because chapter 42.17A RCW contained two more specific

statutes, the legislature intended those civil statutes to "preempt" the application of

---

[2] As Justice Johnson points out, the majority seems to accept that all concealment violations could be subject to treble damages.  Concurrence/dissent at 1.  I share Justice Johnson's concerns with that result.

the felony statute. *Conte*, 159 Wn.2d at 803-05. The trial court agreed and granted

the motion. *Id.* at 803. This court reversed on the ground that neither the more

specific concealment statute (former RCW 42.17.120, *recodified as* RCW

42.17A.435 (2012)) nor another FCPA provision could preempt the criminal RCW

40.16.030 statute because the former statutes were civil and the latter one was

criminal. *Id.* at 807-09, 814.

But this court also held that the two statutes could not be considered

"concurrent" under the test discussed above. It held that RCW 40.16.030, the

criminal statute, contained a mens rea requirement of "knowingly," but that neither

the concealment statute of former chapter 42.17 RCW nor the base penalty

provisions of that chapter (former RCW 42.17.390, *recodified as* RCW

42.17A.750 (2012)) contained such a requirement—so it was possible to violate

the more specific (now) RCW 42.17A.435 concealment statute (containing no

mens rea) without violating the more general criminal statute (containing the mens

rea of "knowingly"). *Conte*, 159 Wn.2d at 811 ("Further, as the State maintains,

RCW 40.16.030 contains a mens rea requirement. Violations of chapter 42.17

RCW can occur that would not meet the beyond a reasonable doubt standard and

would not involve a 'knowingly' mental state. Thus, the two statutes are not

concurrent."). The specific statute within "chapter 42.17 RCW" to which the

*Conte* court referred was none other than the concealment statute at issue in this case. Thus, this court has already held that the concealment statute contains no mens rea.

In this case, that means that a violation of the specific reporting statute, RCW 42.17A.235, will always constitute a violation of the general concealment statute, RCW 42.17A.435.

Fourth and finally, the trial court's actions in this case are also consistent with this interpretation of the statute. In its summary judgment order, the trial court found that GMA violated the concealment statute. Clerk's Papers (CP) at 3339. But that court then reserved for trial the issue of whether GMA's violations were intentional. CP at 3339-40. Under the FCPA, intent does not inhere in specific violations but is relevant only in the assessment of penalties.

Because every reporting violation under the FCPA necessarily produces an accompanying concealment violation, the two statutes are concurrent. Accordingly, "the specific statute prevails to the exclusion of the general" and the State can prevail only on the RCW 42.17A.235 reporting violations. *Shriner*, 101 Wn.2d at 583.

3. The State did not rely on separate acts to differentiate the failure to report violations from the concealment violation

The majority responds to GMA's double-counting argument by holding that GMA's conduct included an "independent act" providing a separate basis for its concealment violation, on top of its reporting violations. The majority explains that "[c]reating the DOB account, soliciting contributions from member companies, and contributing most of that money to No on 522 were not inherently unlawful actions" under the FCPA registration and reporting requirements. Majority at 30. It concludes that those actions were unlawful only because they "were undertaken for the improper purpose of concealment." *Id.* (quoting CP at 3191).

But those actions are inseparable from GMA's failure to report. If GMA had never created a DOB account and never contributed to a political campaign, it would never have become a political committee and would never have been subject to reporting requirements. In other words, GMA's creation of the DOB account and support for the "No on 522" campaign were the acts that caused GMA to become a political committee. But it was GMA's status as a political committee that triggered its FCPA registration and reporting requirements. Punishing GMA once for the actions that made it a political committee and again for its failure to

11

comply with political committee rules is duplicative—they are not truly separate activities.

The majority also relies on the fact that GMA advised its members to divert media attention "for the improper purpose of concealment" to support a separate violation of RCW 42.17A.435. But if GMA had filed the mandatory reports, its advice about avoiding media attention would be lawful and inconsequential—the information would already be publicly available through the PDC. As the majority acknowledges, "[a] trade organization advising its members on communications with the media is not inherently unlawful." Majority at 31. That is exactly why these communications cannot provide a basis for an independent concealment violation.

Thus, every violation of the specific failure-to-report statute also constitutes a violation of the more general concealment statute—not just in the abstract, but also as applied to the acts in this case. For that reason, I would vacate the concealment violation and remand for reassessment of the lump-sum penalty imposed for violations of RCW 42.17A.235, 42.17A.435, and the treble damages provision, RCW 42.17A.780.

CONCLUSION

I agree with the majority's holding that GMA is subject to the requirements of the FCPA and that those requirements satisfy the First Amendment. I also agree that the excessive fines clause of the Eighth Amendment bars disproportionate civil fines and that the amount of the base penalty and trebled fine in this case must be scrutinized with that in mind.

But I would vacate the RCW 42.17A.435 concealment violation. I would therefore remand the entire case to the trial court to reconsider the lump-sum penalty that was imposed without discussion of which portion is attributable to which violation. And I would instruct the trial court to consider the Eighth Amendment excessive fines clause proportionality requirements before imposing *any* FCPA penalties (base or trebled).

I therefore respectfully concur in part and dissent in part.

13

Gordon McCloud, J.

Wiggins, J. P.T.