# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

|  |  |
|---|---|
| STATE OF WASHINGTON,<br><br>         Respondent,<br><br>  v.<br><br>GROCERY MANUFACTURERS<br>ASSOCIATION,<br><br>         Appellant. | No. 49768-9-II<br>Consolidated with<br>No. 50188-1-II |
| GROCERY MANUFACTURERS<br>ASSOCIATION,<br><br>         Appellant,<br><br>  v.<br><br>STATE OF WASHINGTON,<br><br>         Respondent. | PUBLISHED OPINION |

MAXA, J. – The State filed a complaint alleging that the Grocery Manufacturers Association (GMA) failed to comply with the Fair Campaign Practices Act (FCPA), chapter 42.17A RCW, relating to a failed 2013 Washington ballot initiative, Initiative 522 (I-522). I-522 would have required all packaged food products to identify ingredients containing genetically modified organisms (GMOs). The trial court found on summary judgment that GMA had committed multiple FCPA violations by not registering as a political committee and failing to disclose the source of millions of dollars of donations GMA made to the "No on I-522"

campaign. After a bench trial, the court imposed a $6 million civil penalty against GMA for multiple violations of the FCPA and trebled the penalty to $18 million based on a finding that GMA's violation of the law was intentional.

GMA appealed, raising a number of statutory and constitutional issues. This court affirmed the trial court's ruling that GMA violated the FCPA by failing to register as a political committee and rejected GMA's constitutional challenges. However, the court held that the trial court erred in ruling that GMA did not need to subjectively intend to violate the law to be subject to treble damages under the FCPA. The court remanded the penalty for reconsideration under the proper legal standard without reaching GMA's argument that the total $18 million penalty was an excessive fine under the Eighth Amendment to the United States Constitution.

On review, the Supreme Court affirmed that GMA violated the FCPA by failing to register as a political committee and also by concealing the source of contributions, and affirmed this court's constitutional holdings. But the court reversed on the requisite intent for treble damages, holding that the trial court had statutory authority to award treble damages. The court remanded the case to this court for consideration of GMA's Eighth Amendment excessive fines claim.

GMA argues that the $18 million penalty constitutes an excessive fine because it is grossly disproportionate to the gravity of the FCPA violations, which GMA characterizes as solely a reporting offense that did not harm the voting public. The State argues that the penalty is not an excessive fine because GMA not only failed to register as a political committee, it intentionally concealed its members' contributions to the No on I-522 campaign. The State asserts that these actions harmed the public by preventing Washington voters from knowing the identity of the companies that were spending millions of dollars to defeat the initiative.

2

We hold that the $18 million penalty does not violate the Eighth Amendment's excessive fines clause. Therefore, we affirm the trial court's imposition of an $18 million civil penalty on GMA.

FACTS

*Background*

Some of the relevant facts in this case are set out in this court's opinion and the Supreme Court's opinion in GMA's first appeal. *State v. Grocery Manufacturers Ass'n*, 5 Wn. App. 2d 169, 425 P.3d 927 (2018) (*GMA* I), *rev'd in part*, 195 Wn.2d 442, 461 P.3d 334 (2020) (*GMA* II). In addition, the trial court made extensive findings of fact before imposing the civil penalty. GMA did not challenge those findings, so they are verities on appeal.

GMA is a nationwide trade association that represents hundreds of food, beverage, and consumer product companies. Generally, GMA seeks to promote reasonable and national food labeling requirements.

In 2012, GMA opposed a ballot proposition in California, Proposition 37, which would have required producers of packaged food products to label products containing GMOs. Later that year, GMA learned about a similar proposed ballot initiative in Washington, I-522. In January 2013, GMA began planning for an aggressive campaign in Washington to oppose I-522 while at the same time avoiding state financial disclosure requirements. As part of the opposition campaign, GMA created the Defense of Brands (DOB) account to collect funds from some of its member companies and to use them to oppose I-522. Two purposes of the account were to "shield the contributions made from GMA members from public scrutiny" and to "eliminate the requirement and need to publicly disclose GMA members' contributions on state campaign finance disclosure reports." Clerk's Papers (CP) at 4059.

GMA made its first contribution to the No on I-522 campaign from the DOB account in May 2013. GMA solicited over $14 million in contributions from its member companies for the DOB fund and paid $11 million of that amount to the No on I-522 political committee. The payments to the No on I-522 campaign were attributed solely to GMA, with no indication of which member companies had provided the funds. In fact, contributing GMA members were instructed how to respond if they received inquiries about GMA's contributions, "in part to divert attention from the true source of the funds, namely, the individual GMA members." CP at 4061. And in June, GMA removed the names of its members from its website.

Until October 17, GMA did not register with the Public Disclosure Commission (PDC) as a political committee or file any required political committee reports that would have disclosed the contributing members. GMA registered only after receiving a violation notice from the PDC. GMA first disclosed the members who contributed to the DOB account on October 17, a few weeks before the election. And GMA never fully disclosed the total contributions to the DOB account. The trial court found that there were at least 47 reports required under the FCPA that GMA failed to timely or properly file.

*Procedural History*

The State sued GMA for failing to register as a political committee, failing to report financial contributions, and concealing the true source of contributions. The State sought a base penalty of $14,622,820 trebled to $43,868,460. This amount apparently was based primarily on the amount in the DOB fund that GMA failed to timely disclose.

On summary judgment, the trial court ruled that GMA was required to register as a political committee under former RCW 42.17A.005(37) (2011) when it created the DOB account, that GMA violated various FCPA reporting and disclosure requirements for political

4

committees, and that GMA violated RCW 42.17A.435 by concealing the source of the contributions it made to oppose I-522.

After a bench trial on the issue of penalties, the court imposed a $6 million civil penalty against GMA based on (1) GMA's concealment of the amount in the DOB account, (2) GMA's concealment of the source of the contributions to the DOB account, (3) the multiple disclosure reports that were not timely or properly filed regarding finance activities of the DOB account, and (4) the number of days the required reports were late. The court then trebled the penalty to $18 million based on a finding that GMA's violation of the law was intentional.

GMA appealed. *GMA* I, 5 Wn. App. 2d at 182. In *GMA* I, this court held that the trial court did not err in granting summary judgment in favor of the State as to whether GMA qualified as a political committee under former RCW 42A.17.005(37) by receiving contributions for the DOB account to oppose I-522. *Id.* at 191. The court also rejected GMA's constitutional challenges. *Id*. at 191-206.

However, the court held that the trial court erred in ruling that GMA did not need to subjectively intend to violate the law in order to be subject to treble damages under former RCW 42.17A.765(5) (2010). *Id*. at 208-09. The court remanded for further proceedings for the trial court to determine whether GMA was subject to treble damages under the proper standard. *Id*. at 209. Because the court vacated the treble damages award, it did not address GMA's argument that the $18 million penalty was an excessive fine in violation of the Eighth Amendment.

Both parties petitioned for review in the Supreme Court, which granted review. *GMA* II, 195 Wn.2d 442. The Supreme Court affirmed that GMA constituted a political committee and also that GMA intentionally violated the FCPA's prohibition on concealment by using the DOB account to shield the names of contributing members. *Id.* at 453-61, 469-70. The court also held

that the FCPA's registration and disclosure requirements did not violate the First Amendment to the United States Constitution as applied to GMA. *Id.* at 461-69. But the court reversed this court on the issue of the required intent for FCPA violations and held that the FCPA "requires only the intent to accomplish an illegal act," affirming the legal standard applied by the trial court. *Id*. at 475. The court remanded to this court to consider whether the penalty imposed against GMA is an unconstitutional excessive fine. *Id*. at 476.

The court stated, "[W]e caution that our affirming the trial court's statutory authority to impose a treble penalty in this case does not necessarily mean that either the base penalty or the treble penalty that was actually imposed is constitutional." *Id*. at 476. The court also noted, "On remand, this penalty must be scrutinized carefully to ensure that it is based on constitutionally permissible considerations and is not grossly disproportional to GMA's violations of the FCPA's registration and disclosure requirements for political committees." *Id*. at 477.

On remand, GMA challenges the trial court's $18 million penalty.

ANALYSIS

A. FAIR CAMPAIGN PRACTICES ACT

1. Public Policy

The purpose the FCPA is " 'to ferret out . . . those whose purpose is to influence the political process and subject them to the reporting and disclosure requirements of the act in the interest of public information.' " *Voters Educ. Comm. v. Pub. Disclosure Comm'n*, 161 Wn.2d 470, 480, 166 P.3d 1174 (2007) (alteration in original) (quoting *State v. (1972) Dan J. Evans*

*Campaign Comm.*, 86 Wn.2d 503, 508, 546 P.2d 75 (1976)). RCW 42.17A.001[1] sets forth the

declaration of policy of the FCPA, which includes:

> (1) That *political campaign* and lobbying *contributions and expenditures be fully disclosed to the public* and that *secrecy is to be avoided*.
> . . . .
> (10) That the *public's right to know of the financing of political campaigns* and lobbying and the financial affairs of elected officials and candidates far outweighs any right that these matters remain secret and private.

(Emphasis added.)

In addition, RCW 42.17A.001 states that "[t]he provisions of this chapter shall be

liberally construed to promote complete disclosure of all information respecting the financing of

political campaigns and lobbying."

2. Political Committee Reports and Concealment

Under former RCW 42.17A.005(37), a "political committee" means "any person . . .

having the expectation of receiving contributions or making expenditures in support of, or in

opposition to, any candidate or any ballot proposition." A political committee must file a

statement of organization with the PDC "within two weeks after organization or within two

weeks after the date the committee first has the expectation of receiving contributions or making

expenditures in any election campaign, whichever is earlier." Former RCW 42.17A.205(1)

(2011).

A political committee also must file reports with the PDC at various intervals that contain

certain specified information. Former RCW 42.17A.235 (2011); former RCW 42.17A.240

(2010). This includes reporting to the PDC all contributions received and expenditures made.

---

[1] The statute in effect at the time the complaint was filed, former RCW 42.17.010 (1975), was recodified as RCW 42.17A.001 effective January 1, 2012, and amended in 2019. Because the 2019 amendment does not affect our analysis we cite to the current statute.

Former RCW 42.17A.235(1). And a political committee must disclose the name of each person contributing funds to the committee and the amount of the contribution. Former RCW 42.17A.235(3), former RCW 42.17A.240(2).

In addition, the FCPA prohibits concealing the source of contributions:

> No contribution shall be made and no expenditure shall be incurred, directly or indirectly, in a fictitious name, anonymously, or by one person through an agent, relative, or other person in such a manner as to conceal the identity of the source of the contribution or in any other manner so as to effect concealment.

RCW 42.17A.435.

### 3. Penalties

Former RCW 42.17A.750(1) (2011) identifies a range of possible civil penalties for violations of provisions of the FCPA. In particular, former RCW 42.17A.750(1)(c) states that a person who violates any provision in chapter 42.17A RCW may be subject to a civil penalty of not more than $10,000 for each violation. Former RCW 42.17A.750(1)(d) states that a person who fails to timely file a statement or report may be subject to a civil penalty of $10 per day for each day the report or statement is delinquent. In addition, former RCW 42.17A.750(1)(e) states that a person who fails to report a contribution or expenditure as required may be subject to a civil penalty equivalent to the amount not reported. The court may impose one or more of these civil remedies. Former RCW 42.17A.750(1).

Under former RCW 42.17A.765(5), the court may treble the amount of an FCPA judgment as punitive damages "[i]f the violation is found to have been intentional."

## B. EXCESSIVENESS OF $18 MILLION CIVIL PENALTY

GMA argues that the trial court's total civil penalty of $18 million constituted an excessive fine in violation of the Eighth Amendment. We disagree.

1.    Legal Principles

The Eighth Amendment prohibits the imposition of "excessive fines." The Eighth

Amendment excessive fines clause applies to the states through the due process clause of the

Fourteenth Amendment. *Cooper Indus. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 433-34,

121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001).[2]

The excessive fines clause applies when the government requires payments as

punishment for an offense. *United States v. Bajakajian*, 524 U.S. 321, 328, 118 S. Ct. 2028, 141

L. Ed. 2d 314 (1998). The clause also applies to civil cases if the payment constitutes

punishment. *Austin v. United States*, 509 U.S. 602, 609-10, 113 S. Ct. 2801, 125 L. Ed. 2d 488

(1993).

The Court in *Bajakajian* addressed the test for determining whether a punishment violates

the Eighth Amendment: "The touchstone of the constitutional inquiry under the Excessive Fines

Clause is the principle of proportionality: The amount of the forfeiture must bear some

relationship to the gravity of the offense that it is designed to punish." 524 U.S. at 334.

Specifically, "If the amount of the forfeiture is grossly disproportional to the gravity of the

defendant's offense, it is unconstitutional." *Id.* at 337; *see also GMA* II, 195 Wn.2d at 476.

Courts may consider several factors, derived from *Bajakajian*, in determining the

proportionality of a fine to an offense: " '(1) the nature and extent of the crime, (2) whether the

violation was related to other illegal activities, (3) the other penalties that may be imposed for the

---

[2] Article I, section 14 of the Washington Constitution also prohibits excessive fines. In its statement of additional authority, GMA suggests that article I, section 14 is more protective than the Supreme Court's interpretation of the Eighth Amendment. However, GMA did not provide any argument in its briefing that this provision provides greater protection than the Eighth Amendment. Therefore, we do not consider this issue. RAP 10.3(a)(6); *Billings v. Town of Steilacoom*, 2 Wn. App. 2d 1, 33, 408 P.3d 1123 (2017).

violation, and (4) the extent of the harm caused.' " *GMA* II, 195 Wn.2d at 476 (quoting *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1122 (9th Cir. 2004)).

GMA repeatedly analogizes its case to *Bajakajian*, where the Court analyzed these factors. In that case, federal law required Bajakajian, who was leaving the United States, to declare that he was transporting more than $10,000 in currency. 524 U.S. at 324. Bajakajian declared $15,000, but customs inspectors found a total of $357,144 after searching the family's belongings. *Id.* at 325. The Court held that forfeiture of the entire $357,144 actually in his possession would violate the excessive fines clause because (1) it was "solely a reporting offense," (2) it was unrelated to any other illegal activity, (3) the maximum fine under the sentencing guidelines was $5,000, and (4) harm was minimal, as "the Government would have been deprived only of the information that $357,144 had left the country." *Id.* at 337-39.

The Court in *Bajakajian* highlighted two other considerations. First, courts should give deference to the legislature's determination of the appropriate punishment for an offense. *Id.* at 336. "[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* Second, "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise." *Id.*

We review de novo whether a civil penalty violates the excessive fines clause of the Eighth Amendment. *See Black v. Cent. Puget Sound Reg'l Transit Auth.*, 195 Wn.2d 198, 204, 457 P.3d 453 (2020).

2. Excessive Fines Analysis

The State agrees that the Eighth Amendment applies to GMA's civil penalty because the penalty is at least in part punishment for an offense. Therefore, the issue is whether the amount of the penalty was grossly disproportionate to the gravity of GMA's FCPA violations. *See*

*Bajakajian*, 524 U.S. at 337. We apply the factors stated in *GMA* II, 195 Wn.2d at 476, in analyzing the proportionality of the civil penalty imposed against GMA.

First is the nature and extent of the offense. GMA minimizes the violation, stating that it was merely a reporting offense as in *Bajakajian*. And GMA points out that although Bajakajian knowingly lied, GMA believed that its description of itself as the source of its contributions was true.

In assessing the $6 million penalty for GMA's FCPA violations and trebling that amount, the trial court made an unchallenged finding regarding "factors that weigh in favor of the court imposing a more substantial penalty":

> Those factors include: violation of the public's right to know the identity of those contributing to campaigns for or against ballot title measures on issues of concern to the public, the sophistication and experience of GMA executives, the failure of GMA executives to provide complete information to their attorneys, the intent of GMA to withhold from the public the true source of its contributors against Initiative 522, the large amount of funds not reported, the large number of reports filed either late or not at all, and the lateness of the eventual reporting just shortly before the 2013 election.

CP at 4069. These factors relate to the gravity of GMA's offense.

We conclude that GMA's FCPA violations were serious and significant. The trial court's finding quoted above supports this conclusion. GMA's penalty reflects more than failing to register as a political committee and submit various reports. GMA expressly designed the DOB account to intentionally shield its members' political activity from public scrutiny in a campaign involving a contentious ballot proposition. Because of GMA's intentional actions, Washington voters were deprived of knowing that multiple companies were spending millions of dollars to defeat I-522 and the identity of those companies. GMA infringed on the FCPA's first stated policy: "That *political campaign* and lobbying *contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided*." RCW 42.17A.001(1) (emphasis added).

11

Second is whether the violation was related to other illegal activities. GMA argues that its reporting offense involved no other illegal activities and emphasizes that its violations related to political speech. The State argues that GMA's failure to register was tied to its illegal efforts to conceal the true source of the funds GMA used to oppose I-522.

The Supreme Court held that GMA violated the FCPA by failing to register as a political committee in violation of former RCW 42.17A.205(1) and former RCW 42.17A.235. *GMA* II, 195 Wn.2d at 461. GMA focuses only on that violation. But the court also held that GMA intentionally violated RCW 42.17A.435, the prohibition on concealment. *Id.* at 469-70. The court emphasized the trial court's findings that GMA specifically intended to create a plan to allow its contributing members to remain anonymous and avoid state filing requirements and provided advice to its members on how to divert the media's attention from the true source of No on I-522 funding for the improper purpose of concealment. *Id.* at 470. Therefore, GMA's violation involved multiple illegal activities.

Third is whether other penalties may be imposed for the violation. In applying this factor, we look to the penalties the legislature authorized and the maximum penalties that could have been imposed. *$100,348.00 in U.S. Currency*, 354 F.3d at 1122. GMA argues that under former RCW 42.17A.750(1)(c) and (d), the $10,000 per violation and the $10 per day penalties for GMA's multiple violations would total only $622,820. Even trebling that amount would result in a maximum penalty of $1.87 million. GMA emphasizes that the actual penalty was nearly 10 times higher than this penalty.

However, as GMA must acknowledge, former RCW 42.17A.750(1)(f) authorized the trial court to impose a civil penalty *equal to the amount of the unreported contributions*. The trial court found that GMA contributed $11 million to the No on I-522 campaign, and collected over

$14 million in the DOB account. The State actually requested a civil penalty of $14,622,820, trebled to over $43 million, based on the value of these unreported contributions.

The $18 million penalty the trial court imposed was well within the maximum penalty that the trial court could have imposed under FCPA provisions. GMA claims that the amount undisclosed cannot be determinative because otherwise no disclosure penalty could ever be excessive. But the legislature's authorization of such a fine clearly is relevant to the excessive fines analysis. Because a major concern regarding the failure to disclose the source of campaign contributions is how that failure interferes with public information during the electoral process, the harm caused by concealing the source of contributions necessarily is tied to the size of the contributions.

Fourth is the extent of the harm. GMA argues that its violations caused minimal harm because the voting public knew that GMA's contributions were coming from grocery manufacturers and GMA did make the required disclosures before the election. And GMA notes the trial court's finding that it was impossible to know if GMA's violation affected the outcome of the election.

We conclude that the harm GMA caused with its FCPA violations was substantial. The harm was that GMA undermined the transparency of the ballot proposition measure and intentionally denied the voters information related to substantial campaign contributions from otherwise unidentified parties over an extended period of the election season.

As the Supreme Court noted, the FCPA disclosure requirements are designed to allow the public to " 'follow the money' " regarding campaigns. *GMA* II, 195 Wn.2d at 455 (quoting *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 997 (9th Cir. 2010)). GMA began donating money to the No on I-522 campaign through the DOB fund in May 2013. But it was

not until October 17 that GMA disclosed that it had been raising money as a political committee and identified the member companies that had donated to the DOB fund. Therefore, for most of the campaign period Washington voters were deprived of critical "follow the money" information – that individual companies were donating millions of dollars to defeat I-522.[3]

Considering all of these factors, we conclude that the trial court's $18 million penalty was not grossly disproportionate to the gravity of GMA's FCPA violations. Those violations were serious and significant, and represented an intentional attempt to conceal the identity of companies donating millions of dollars in a contentious ballot campaign. The penalty imposed was well within the limits established by former RCW 42.17A.750(1)(f) and former RCW 42.17A.765(5), and the legislature is entitled to some deference in authorizing those penalties. *Bajakajian*, 524 U.S. at 336. In addition, GMA's offense caused significant harm. Voters evaluating I-522 were deprived of the opportunity to "follow the money" and determine what companies were opposing the initiative. And GMA's violations had the potential of eroding the public's confidence in Washington's electoral process.

Accordingly, based on our analysis of the *Bajakajian* factors endorsed in *GMA* II, we hold that the $18 million civil penalty imposed on GMA does not constitute an excessive fine in violation of the Eighth Amendment.

### 3. First Amendment Considerations

Amicus Center for Competitive Politics ("CCP") argues that the proportionality analysis must take into account First Amendment considerations. CCP asserts that because the $18

---

[3] GMA also suggests consideration of a fifth factor: whether an offender fits within the class of offenders targeted by the FCPA. GMA argues that the FCPA targets those who would use deceit to sway elections or hide contributions that influence elected officials, and that GMA does not fall into that category. But establishing a separate, undisclosed account to conceal the true source of campaign contributions is exactly the sort of activity the FCPA targets.

million penalty has the potential to chill constitutionally protected speech, we should incorporate an "exacting scrutiny" standard. This standard requires that burdens on protected speech have a substantial relation with a sufficiently important governmental interest. *See Doe v. Reed*, 561 U.S. 186, 196, 130 S. Ct. 2811, 177 L. Ed. 2d 493 (2010) (addressing First Amendment challenges to campaign disclosure requirements).

However, CCP cites no United Sates Supreme Court or Washington authority or authority from any other jurisdiction to support its position that an exacting scrutiny standard must be included in the Eighth Amendment excessive fines analysis. And our Supreme Court in *GMA* II did not suggest that such a standard applies; it endorsed the *Bajakajian* factors. *See* 195 Wn.2d at 476.

Further, as the State points out, the $18 million penalty was not imposed because of GMA's speech. The penalty was imposed because GMA concealed the source of the funding for its speech, and GMA has identified no constitutional right to conceal the source of campaign constitutions.

### 4. Selective Enforcement

In its statement of additional authorities, GMA cites *State ex rel. Pub. Disclosure Comm'n v. Food Democracy Action!*, 5 Wn. App. 2d 542, 544-48, 427 P.3d 699 (2018), *review denied*, 195 Wn.2d 1030 (2020), on the issue of whether the State selectively pursued treble damages against GMA. GMA references a footnote in *GMA* II that stated: "We express no opinion as to whether the State selectively pursued treble damages in this case, but that issue may be relevant to GMA's excessive fines claim on remand." 195 Wn.2d at 473 n.6.

In *Food Democracy*, the trial court imposed a $319,281.58 penalty against an organization that supported I-522 for raising over $295,000 without registering as a political

15

committee.  5 Wn. App. 2d at 547.  However, the State did not seek treble damages.  *Id.*  GMA's implication apparently is that the State favored supporters of I-522 by not seeking treble damages against them while seeking treble damages against opponents of I-522.

However, the *Food Democracy* opinion does not contain sufficient facts to determine whether the State's failure to seek treble damages somehow was inappropriate.  And nothing in the record of this case suggests that the State should have sought treble damages in that case.  Conversely, the Supreme Court in *GMA* II expressly held that the facts of this case supported the trial court's imposition of treble damages.  195 Wn.2d at 471-75.

CONCLUSION

We affirm the trial court's imposition of an $18 million civil penalty on GMA.

_____
MAXA, J.

We concur:

_____
WORSWICK, J.

_____
LEE, C.J.

16